1  STEVEN T. GUBNER - State Bar No. 156593
   RICHARD D. BURSTEIN- State Bar No. 56661
2  BARAK VAUGHN - State Bar No. 227926
   **EZRA | BRUTZKUS | GUBNER LLP**
3  21650 Oxnard Street, Suite 500
   Woodland Hills, California 91367
4  Telephone: (818) 827-9000
   Facsimile: (818) 827-9099
5
   Attorneys for David R. Hagen, Chapter 7 Trustee
6

7

8              **UNITED STATES BANKRUPTCY COURT**

9              **CENTRAL DISTRICT OF CALIFORNIA**

10             **SAN FERNANDO VALLEY DIVISION**

11 | In re                                 ) Case No. 1:06-bk-10733-GM
                                           )
12 | MERIDIAN HEALTH CARE                  ) Chapter 7
     MANAGEMENT, INC., a Delaware          )
13 | Corporation,                          ) Adv. No. 1:07-ap-01186-GM
                                           ) (lead case upon consolidation)
14 |              Debtor.                  )
                                           ) Adv. No. 1:07-ap-01050-GM
15 | _____       )
                                           ) Adv. No. 1:07-ap-01049-GM
16 | DAVID R. HAGEN, Chapter 7 Trustee,    )
                                           )
     Plaintiff,                            )
17 |          vs.                          ) **NOTICE OF MOTION AND MOTION**
                                           ) **FOR ORDER CONSOLIDATING**
18 | NAUTIC PARTNERS, LLC, a Delaware      ) **ADVERSARY PROCEEDINGS OR IN**
     Limited Liability Corporation;        ) **THE ALTERNATIVE, TO STAY THE**
19 | CHISHOLM PARTNERS IV, LP; a           ) **ADVERSARY PROCEEDINGS;**
     Delaware Limited Partnership; FLEET   ) **DECLARATION OF BARAK VAUGHN**
20 | VENTURE RESOURCES, INC.; a            ) **IN SUPPORT THEREOF**
     Delaware Limited Liability Corporation;)
21 | FLEET EQUITY PARTNERS VI LP; a        )
     Delaware Limited Partnership;          )
22 | KENNDEY PLAZA PARTNERS II,            ) Date:   October 3, 2007
     LLC; a Limited Liability Corporation;  ) Time:   1:30 p.m.
23 | SCOTT HILINSKI; a Individual; BRIAN   ) Place:  Ctrm. 303
     SATO, an Individual; MICHAEL ALPER,   )         21041 Burbank Blvd.
24 | an Individual; E4E, INCORPORATED; a   )         Woodland Hills, CA 91367
     Delaware Corporation;                  )
25 | FAMILY/SENIORS MEDICAL GROUP,         )
     a California Professional Medical      )
26 | Corporation; INC.; NORTHRIDGE         )
     MEDICAL GROUP, INC., a California      )
27 | Professional Medical Corporation,     )
                                           )
28 |              Defendants.              )
   | _____       )

**TO THE HONORABLE GERALDINE MUND, UNITED STATES BANKRUPTCY JUDGE AND OTHER PARTIES IN INTEREST**:

   **PLEASE TAKE NOTICE** that on October 3, 2007, at 1:30 p.m, or as soon thereafter as the matter may be heard in Courtroom 303 of the United States Bankruptcy Court located at 21041 Burbank Blvd., Woodland Hills, CA 91367, David R. Hagen, the duly appointed and acting Chapter 7 Trustee in the above captioned action ("Trustee") will, and hereby does, apply for an Order permitting the consolidation of the Adversary Proceedings Nos. SV-07-1049 and 07-1050 with the newly filed Adversary Proceeding No. 07-01186.  These adversary proceedings seek to avoid the transfer of property from Northridge Medical Group and Family Seniors Medical Group to multiple defendants, including Meridian Health Care Management, Inc. ("Debtor") (collectively "Removed State Court Actions").  The Trustee's recently filed Adversary Proceeding, Adv. SV 07-01186, seeks to avoid fraudulent transfers from the Debtor to the above-captioned Defendants as well other causes of action based on the common questions of law and fact with the Removed State Court Actions.  No party has filed an answer to the adversary proceedings.  In the alternative, the Trustee requests that the Court stay the Removed State Court Actions pending resolution of the Trustee's Adversary Proceeding.

   This Motion is made pursuant to 11 U.S.C. § 1109(b) and Federal Rules of Bankruptcy Procedure Rule 7042.  Consolidation and/or a stay of the Adversary Actions are appropriate pursuant to Federal Rule of Bankruptcy Procedure ("FRBP") 7042.  Moreover, the consolidation or stay sought by the Trustee will facilitate judicial economy and ensure that all issues involving the same fact pattern, parties, agreements and claims are tried at one time in one forum.

   The Motion is based on this Notice of Motion, the attached Memorandum of Points and Authorities, the Declaration of Barak Vaughn and exhibits thereto, as well as all other oral or documentary evidence as may properly by presented to this Court at the hearing on this Motion.

   **PLEASE TAKE FURTHER NOTICE** that Local Bankruptcy Rule ("LBR") 9013-1(a)(7) requires any response to the Motion to be in writing, filed with the Clerk of the United States Bankruptcy Court, 21041 Burbank Blvd., Woodland Hills, CA 91367, and served upon Plaintiff's counsel, whose address appears in the upper left corner of the first page of this Notice

1  of Motion, no later than fourteen (14) days prior to the above-scheduled hearing date.  Pursuant

2  to LBR 9013-1(a)(11), failure to timely file and serve a responsive pleading may be deemed to

3  constitute consent to the instant request herein.

4  DATED:  August 29, 2007                    EZRA | BRUTZKUS | GUBNER LLP

5

6

7                                             By: _____

8                                                 STEVEN T. GUBNER
                                                  RICHARD D. BURSTEIN
9                                                 BARAK VAUGHN
                                                  Attorneys for David R. Hagen,
10                                                Chapter 7 Trustee

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# MEMORANDUM OF POINTS AND AUTHORITIES

## I.

## INTRODUCTION

By this Motion, the Trustee seeks to consolidate or in the alternative, stay, the Removed State Court Actions with the Trustee's new adversary action (collectively, the "Actions"). At this time, the Actions are currently pending before this Court. The Trustee is the plaintiff in each of the three (3) Actions and the Debtor is a Defendant in the Removed State Court Actions. Consolidation of the Actions will promote judicial economy and assist all of the parties in focusing their discovery and litigation efforts. It makes little sense to adjudicate claims based on an almost identical fact pattern involving the identical parties in more than one adversary proceeding. Thus, this Motion and the relief sought by this Motion benefits all interested parties as it will promote a focused and cost effective resolution of the pending litigation before this Court. Alternatively, a stay is appropriate of the Removed State Court Actions to permit the issues to be adjudicated among the parties in the Trustee's Adversary Proceeding.[1]

## II.

## STATEMENT OF FACTS

On or about April 3, 3006, Northridge Medical Group ("Northridge") and Family Seniors Medical Group ("Family Senior") filed actions in the Los Angeles Superior Court against the Nautic Parties, Mr. Hilinski, the Debtor and two of the Debtor's board of directors, Mr. Alper and Mr. Sato. (Attached hereto as Exhibit "1" and "2" and incorportated herein by this reference are true and correct copies of State Court Complaints filed by Northridge and Family Senior, respectively). On or about May 16, 2006, the Debtor filed a voluntary petition for chapter 7 relief, thereby commencing this bankruptcy case. On or about March 8, 2007, the Trustee filed a Notice of Removal for both the Northridge and Family Senior actions (collectively "Removed State Court Actions").

---

[1] On September 5, 2007, the Court will have heard the Nautic Parties Motions to Dismiss/Remand the Removed State Court Actions. The Court's ruling thereon affects its disposition of this Motion.

4

On or about August 20, 2007, the Trustee filed a new adversary proceeding against the

Nautic Parties, Mr. Hilinski, Mr. Alper, Mr, Sato and numerous other parties, which seeks to

avoid fraudulent transfers from the Debtor to the above-captioned Defendants as well as

asserting numerous other causes of action ("Fraudulent Transfer Action"). (Attached hereto as

Exhibit "3" and incorporated by this reference is a true and correct copy of the Fraudulent

Transfer Complaint filed by the Trustee).

As evidenced by the Removed State Court Complaints and the Fraudulent Transfer

Complaint recently filed by the Trustee, the facts at issue are similar and the parties are the same.

*See* Exhibits "1-3". The factual determinations involve the same parties and the same fraudulent

scheme that brought the demise of the Debtor.

### III.

### CONSOLIDATION AND/OR A STAY OF THE REMOVED ADVERSARY

### PROCEEDINGS WITH THE TRUSTEE'S NEWLY FILED ADVERSARY

### PROCEEDING IS APPROPRIATE

Rule 42(a) of the *Federal Rules of Civil Procedure* ("FRCP") provides:

> "When actions involving a common question of law or fact are pending
>
> before the court, it may order a joint hearing or trial of any or all the matters in
>
> issue in the actions; it may order all the actions consolidated; and it may make
>
> such orders concerning proceedings therein as may tend to avoid unnecessary
>
> costs of delay." *See* FRCP 42(a). Rule 42(a) is made applicable to bankruptcy
>
> proceedings by Rule 7042 of the Federal Rules of Bankruptcy Procedure.

FRCP 42(a) gives a court "broad powers to consolidate actions involving common

questions of law and fact if, in its discretion, such consolidation would facilitate the

administration of justice." *Unites States v. Dentsply Int'l, Inc.*, 190 F.R.D. 140, 142-3 (D.

Del.1999). The opportunity for consolidation is designed to promote not only judicial economy

but also the expeditious and efficient conduct of litigation for all concerned. *Johnson v,*

*Manhattan Railway Co.*, 289 U.S. 479, 496-97 (1973); *In re Repetitive Stress Injury Litigation*,

11 F.3d 368, 373 (2nd Cir.1993). In excercising this discretion, the court must "balance the

1    savings of time and effort gained through consolidation against the inconvenience, delay, or

2    expense that might result from the simultaneous disposition of the separate actions." *Rohn and*

3    *Hass Co. v. Mobile Oil Corp.*, 523 F. Supp. 1298, 1309 (D.Del.1991).

4         Consolidation and/or a stay of the Removed State Court Actions with the Trustee's

5    Fraudulent Transfer Action is appropriate.  Further, consolidation and/or a stay will undoubtedly

6    promote judicial economy as well as the expeditious and efficient litigation of these actions.

7                                           **IV**.

8                                    **CONCLUSION**

9         Based on the foregoing, the Trustee respectfully requests that the Actions be

10   consolidated; or in the alternative, stayed, and submits that either consolidation or a court stay is

11   appropirate under FRBP 7042.

12

13   DATED:  August 29, 2007                    EZRA | BRUTZKUS | GUBNER LLP

14

15

16   By: _____
                                          STEVEN T. GUBNER
17                                        RICHARD D. BURSTEIN
                                          BARAK VAUGHN
18                                        Attorneys for David R. Hagen,
                                          Chapter 7 Trustee
19

20

21

22

23

24

25

26

27

28

                                            6

## DECLARATION OF BARAK VAUGHN

I, Barak Vaughn, declare as follows:

1.    I am an attorney at law, duly licensed to practice before all courts of the State of California and I am an associate of Ezra | Brutzkus | Gubner LLP, attorneys of record for David Hagen, the duly appointed and acting Chapter 7 Trustee (the "Trustee") of the bankruptcy estate (the "Estate") of the above-captioned debtor Meridian Health Care Management, Inc. (the "Debtor").  I make this declaration of my own personal knowledge on the facts set forth below and if called as a witness I could and would testify competently thereto.

2.    On or about April 3, 3006, Northridge Medical Group ("Northridge") and Family Seniors Medical Group ("Family Senior") filed actions in the Los Angeles Superior Court against the Nautic Parties, Mr. Hilinski, the Debtor and two of the Debtor's board of directors, Mr. Alper and Mr. Sato.  (Attached hereto as Exhibit "1" and "2" and incorporated herein by this reference are true and correct copies of State Court Complaints filed by Northridge and Family Senior, respectively).

3.    On or about May 16, 2006, the Debtor filed a voluntary petition for chapter 7 relief, thereby commencing this bankruptcy case.

4.    On or about March 8, 2007, the Trustee filed a Notice of Removal for both the Northridge and Family Senior actions (collectively "Removed State Court Actions").

5.    On or about August 20, 2007, the Trustee filed a new adversary proceeding against the Nautic Parties, Mr. Hilinski, Mr. Alper, Mr, Sato and numerous other parties, which seeks to avoid fraudulent transfers from the Debtor to the above-captioned Defendants as well as asserted numerous other causes of action ("Fraudulent Transfer Action").  (Attached hereto as Exhibit "3" and incorporated by this reference is a true and correct copy of the Fraudulent Transfer Complaint filed by the Trustee).

/ / /

/ / /

/ / /

6.    As evidenced by the Removed State Court Complaints and the Fraudulent Transfer Complaint recently filed by the Trustee, the facts at issue are similar and the parties are the same. *See* Exhibits "1-3". The factual determinations involve the same parties and the same fraudulent scheme that brought the demise of the Debtor.

I declare under penalty of perjury under the laws of United States of America that the foregoing is true and correct.

Executed this 29th day of August 2007, at Woodland Hills, California.

BARAK VAUGHN

# EXHIBIT "1"

1  UZZELL S. BRANSON III (State Bar No. 46561)
   A Professional Corporation
2  LAW OFFICES OF UZZELL S. BRANSON III
   70 South Lake Avenue, Suite 660
3  Pasadena, California 91101
   Telephone: (626) 683-8925
4  Telecopier: (626) 683-8512

5  Attorneys for Plaintiff, Northridge
   Medical Group, Inc.

6

7

8

9

10

CONFORMED COPY
OF ORIGINAL FILED
Los Angeles Superior Court

FEB 1 4 2006

John A. Clarke, Executive Officer/Clerk
By_____, Deputy
J. SUNGA

## SUPERIOR COURT OF THE STATE OF CALIFORNIA

## FOR THE COUNTY OF LOS ANGELES

| | |
|---|---|
| 11  NORTHRIDGE MEDICAL GROUP, INC., a California medical professional corporation, <br><br>12 <br> 13              Plaintiff, <br><br>             v. <br><br>14  NAUTIC PARTNERS, LLC; CHISHOLM PARTNERS IV, LP; FLEET VENTURE <br>15  RESOURCES, INC.; FLEET EQUITY PARTNERS VI, LP; KENNEDY PLAZA <br>16  PARTNERS II, LLC; MERIDIAN HEALTH CARE MANAGEMENT, INC.; SCOTT <br>17  HILINSKI; BRIAN SATO; MICHAEL ALPER; and DOES 1 through 100, inclusive, <br><br>18 <br>19              Defendants. | Case No.  B C 3 4 7 4 8 0 <br><br>COMPLAINT FOR: FRAUD; NEGLIGENT MISREPRESENTATION; CONSPIRACY TO COMMIT FRAUD; CONVERSION; VIOLATIONS OF BUSINESS AND PROFESSIONS CODE § 17200; BREACH OF CONTRACT; TORTIOUS INDUCEMENT OF BREACH OF CONTRACT; RESTITUTION AND CONSTRUCTIVE TRUST; AND INJUNCTIVE AND DECLARATORY RELIEF |

20

21       Plaintiff Northridge Medical Group, Inc., a California professional medical corporation

22  ("Plaintiff"), for cause of action against Defendants and each of them, alleges as follows:

23                         **GENERAL ALLEGATIONS**

24       1.    Plaintiff was at times relevant hereto, and is, a California professional medical

25  corporation with its principal place of business in Northridge, County of Los Angeles,

26  California, operating as an independent practice association in the providing of medical services.

27  Plaintiff provides medical services to its managed care patients primarily in the central San

28

1

COMPLAINT OF NORTHRIDGE MEDICAL GROUP, INC.

1 Fernando Valley area of Los Angeles County and surrounding areas, ranging from children and

2 their families to seniors on Medicare, through a network of several hundred physicians and other

3 health care providers who contract with Plaintiff to provide such services.

4      2.    Defendant Nautic Partners LLC was at all times relevant hereto, and is, a

5 Delaware limited liability corporation with its principal place of business in Providence, Rhode

6 Island, specializing in the formation and structuring of, investment in, and participation in and

7 management of, among others, companies engaged in the providing of healthcare administration

8 and management services in California and other locations in the United States, and the

9 successor in interest of Fleet Equity Partners (collectively, "Nautic").

10      3.    Defendants Chisholm Partners, IV, L.P. ("Chisholm") and Fleet Equity Partners

11 VI, L.P. ("Fleet Equity") each was at all times relevant hereto, and is, a Delaware limited

12 partnership; Defendant Fleet Venture Resources, Inc. ("Fleet Venture") was at all times relevant

13 hereto, and is, a Delaware corporation; and Kennedy Plaza Partners II, LLC was at all times

14 relevant hereto, and is, a Delaware limited liability company ("Kennedy").  Chisholm, Fleet

15 Equity, Fleet Venture and Kennedy have had at all times relevant hereto, and have, offices and

16 principal places of business in Providence, Rhode Island.

17      4.    Defendant Meridian Health Care Management, Inc. ("Meridian") was at all times

18 relevant hereto, and is, a Delaware corporation with its offices and principal place of business in

19 Woodland Hills, County of Los Angeles, California, engaged in the business of providing

20 operations, management and administrative services for independent practice associations such

21 as Plaintiff.

22      5.    Defendant Scott Hilinski ("Hilinski" and with Nautic, Chisholm, Fleet Equity,

23 Fleet Venture and Kennedy, collectively the "Nautic Defendants") was at all times relevant

24 hereto, and is, a Managing Director of Nautic, concentrating in its healthcare operations.

25 Although the precise nature and extent of the relationships among the Nautic Defendants is not

26 yet fully known to Plaintiff, all of them  participated in and in and benefitted from, the acts,

27 events and conduct alleged herein, and at all times relevant hereto, and Hilinski was at all times

28

**2**

COMPLAINT OF NORTHRIDGE MEDICAL GROUP, INC.

11

1    relevant hereto, and is, a principal, manager and/or agent of each of the Nautic Defendants with
2    respect to the facts and events hereinbelow alleged.  From and after mid-1999 Hilinski was a
3    member of the Board of Directors of Meridian, appointed to represent the interests of the Nautic
4    Defendants, and from and after September, 2002 Hilinski was the sole member the Board of
5    Directors of Meridian representing the interests of the Nautic Defendants.  Hilinski in the act,
6    conduct and omissions alleged hereinbelow at all times relevant hereto was, and is, acting within
7    the course and scope of his actual, ostensible, apparent and/or implied authority as Managing
8    Director of Nautic and as director, officer, agent and/or employee of Meridian, and Plaintiff is
9    informed and believes and on that basis alleges that Hilinski at all relevant times acted within the
10    course and scope of his actual, ostensible, apparent and/or implied authority as a director, officer,
11    agent and/or employee of the other Nautic Defendants and each of them, and with their
12    permission, acquiescence and consent.

13          6.          Defendant Michael Alper ("Alper") was at all times relevant hereto the President
14    and Chief Executive Officer of Meridian, as well as a member of Meridian's Board of Directors,
15    and a resident of the County of Los Angeles, State of California.  Alper in the acts, conduct and
16    events set forth in this Complaint at all relevant times acted within the course and scope of his
17    actual, ostensible, apparent and/or implied authority as a director, officer, agent and/or employee
18    of Meridian and with its permission, acquiescence and consent, and within the course and scope
19    of his actual and apparent authority and agency conferred on him by Hilinski and the Nautic
20    Defendants.

21          7.          Defendant Brian Sato ("Sato," and with Meridian and Alper, the "Meridian
22    Defendants") was at all times relevant hereto the Chief Financial Officer of Meridian, as well as
23    a member of Meridian's Board of Directors, and a resident of the County of Los Angeles, State
24    of California.  Sato in the acts, conduct and events set forth in this Complaint at all relevant
25    times acted within the course and scope of his actual, ostensible, apparent and/or implied
26    authority as a director, officer, agent and/or employee of Meridian and with its permission,
27    acquiescence and consent, and within the course and scope of his actual and apparent authority
28

3

1    and agency conferred on him by Hilinski and the Nautic Defendants.

2        8.    The true names and capacities of Defendants Does 1-100, inclusive (with the

3    Nautic Defendants and the Meridian Defendants sometimes collectively termed the

4    "Defendants"), are now unknown to Plaintiff, and said Defendants are thus sued by fictitious

5    names.  Plaintiff is informed and believes, and thereon alleges, that each Doe Defendant bears

6    some legal responsibility for some or all of the allegations hereinafter set forth, and was, at

7    various times herein mentioned, the agent, employee, officer, director and/or partner of some or

8    all of the other Defendants, acting within the course and scope of such relationship or

9    relationships.

10        9.    Prior to July, 1999 Meridian's predecessor in interest Meridian Health Care

11    Management, LP ("Meridian LP") was a Delaware limited partnership with its offices and

12    principal place of business in the County of Los Angeles, State of California, engaged in the

13    business of providing operations, management and administrative services for independent

14    practice associations such as Plaintiff.  In or about July, 1999, the Nautic Defendants and

15    Meridian LP, together with Alper and Sato, among others, entered into a plan for Meridian to be

16    formed to assume the business operations and assets of Meridian LP and for the Nautic

17    Defendants concurrently to become primary investors in, and to participate in the management,

18    control and operation of, Meridian.  Pursuant to this agreement and plan, on or about July 24,

19    1999 Meridian was incorporated and on or about July 26, 1999 Meridian and the Nautic

20    Defendants entered into certain agreements under which the Nautic Defendants acquired all of

21    the issued and outstanding preferred stock of Meridian as well as subordinated debt issued to

22    them by Meridian in the principal amount of $3,750,000.

23        10.    In or about August of 1999, in the County of Los Angeles, State of California,

24    Meridian agreed with Plaintiff for Meridian to provide management, administrative and related

25    services to Plaintiff, as set forth in the Management Services Agreement dated as of July 1, 1999

26    between Plaintiff and Meridian LP and Amendment 001 to Management Services Agreement

27    dated as of September 1, 1999 between Meridian and Plaintiff (collectively termed and attached

28

**4**

COMPLAINT OF NORTHRIDGE MEDICAL GROUP, INC.

13

1  with its subsequent amendments as Exhibit "1" hereto and incorporated by reference as, the

2  "Northridge MSA").  Pursuant to the Northridge MSA Meridian, and through Meridian the

3  Nautic Defendants, among other things obtained exercised operational control over certain bank

4  accounts, revenues and funds of Northridge, and were and are obligated to account fairly and

5  accurately for Meridian's stewardship and handling of Northridge funds.

6          11.      Plaintiff is informed and believes and on that basis alleges that beginning in mid-

7  2003, Meridian began experiencing financial difficulty, and during the period June-September,

8  2003 lost significant customer accounts resulting in significant financial losses and negative

9  cashflows, and that Hilinski (who was Chairman of the Audit and Compensation Committees of

10  Meridian's Board of Directors), Alper and Sato were aware of and discussed these events.

11  Plaintiff is further informed and believes, and on that basis alleges, that during this period Alper

12  and Sato conferred with Helinski about Meridian's financial position and cashflow shortages,

13  including among others a telephone discussion in October, 2003 in which, among other things,

14  the following occurred:

15          (a)      Alper requested that Nautic and/or the Nautic Defendants provide

16          additional cash of several million dollars to Meridian, which Hilinski immediately

17          refused; and

18          (b)      Hilinski, Alper and Sato accordingly discussed alternative ways of

19          meeting Meridian's cash needs, and agreed to take funds from customer accounts,

20          including the accounts of Plaintiff, over which Meridian had control but which Meridian

21          had not earned and to which Defendants were not entitled, to provide cash for the benefit

22          of Meridian and the Nautic Defendants.

23          12.      Pursuant to this agreement, from approximately October of 2003 until discovery

24  of their scheme in or about December, 2005, the Defendants, principally through Hilinski, Alper

25  and Sato, entered into and pursued a scheme of employing funds of Meridian clients, including

26  particularly and without limitation funds of Plaintiff, for the benefit and use of the Defendants to

27  meet ongoing expenses and obligations of Meridian which the Nautic Defendants, through

28

**5**

14

Hilinski, refused to fund.  Pursuant to this scheme, among other things, Defendants, directly and through Sato, Alper and Hilinski as their representatives and agents, did the following:

      (a)    Knowingly misappropriated approximately $6,000,000 in Plaintiff's funds entrusted to and under the control of Meridian, and sums which Plaintiff is informed and believes and on that basis alleges total additional millions of dollars in funds of other Meridian accounts and amounted to several hundred thousand dollars in client funds per month throughout 2004 and part of 2005;

      (b)    Falsely presented the financial condition, business operations and liabilities of Meridian, among other means by causing improper and false adjusting entries to be made to the accounts and records of Meridian, concealing the actual balances in customer fund accounts to hide the misappropriations of customer funds; and

      (c)    Interrupted and discontinued the annual audits of Meridian for the year ending December 31, 2003 and thereafter, and failed to put in place adequate or prudent financial controls for Meridian.

The acts and conduct of Defendants were intended to, and did, conceal their wrongful conduct and among other things induced Plaintiff and other clients of Meridian to continue to trust and rely upon the apparent financial and operational stability of Meridian, which had received clean or unqualified opinions on its financial statements from its outside auditors Deloitte & Touch LLP for the years ending December 31, 2001 and 2002.  Defendant Hilinski and other members of Meridian's Board of Directors knew the Meridian financials statements were false, or acted with reckless indifference to their truth or falsity.

    13.    During this same period, the Defendants made and caused and permitted to be made affirmative misrepresentations to Plaintiff to conceal the financial difficulties of Meridian and persuade Plaintiff that Meridian continued to be a stable and financially sound business operation in which Plaintiff could continue to repose trust and confidence.  These misrepresentations included, in particular and without limitation, the use of Nautic's public statements and representations about its financial strength and expertise, when the Nautic

6

1  Defendants had already refused to provide additional funding to Meridian. These

2  representations were made, among other times, at or about the time that the Defendants

3  recognized and acknowledged among themselves, that the redemption by Meridian of the

4  preferred stock held by the Nautic Defendants and repayment to the Nautic Defendants of the

5  Notes, which were to have taken place respectively in March and July of 2004, could not be

6  implemented because of the financial condition of Meridian as above alleged.

7         14.     During this same period, in furtherance of the interests of the Nautic Defendants

8  as well as the Meridian Defendants, Defendants beginning in early 2004 undertook efforts to

9  arrange for a sale of the positions of the Nautic Defendants in Meridian to prospective third

10  parties, among other things so the Nautic Defendants could recoup their investments in

11  Meridian. These efforts, which culminated in a purchase and sale transaction with e4e,

12  Incorporated in or about August 2005, were furthered by, and made possible only by, the

13  continued misappropriations by and on behalf of the Defendants of customer funds, in particular

14  the millions of dollars of Plaintiff's funds, which enabled the Defendants to continue to present

15  Meridian as a viable business and attractive acquisition.

16         15.     Further, the acts and conducts of the Defendants as set forth above, by concealing

17  the true condition of the Meridian business as well as the wrongful misappropriations of

18  Plaintiff's funds, prevented Plaintiff from obtaining the benefits of the Northridge MSA and

19  from exercising its rights and remedies under the Northridge MSA. Plaintiff has performed all

20  duties and obligations on its part to be performed herein, except as performance thereof has been

21  excused by the acts, conduct and/or omissions of Defendants.

22         16.     Plaintiff as a proximate result of the acts and conduct of Defendants as alleged

23  above, has sustained losses of its property in sums not yet fully ascertained but which Plaintiff is

24  informed and believes and on that basis alleges, presently exceed $6,000,000. Further, by reason

25  of such losses Plaintiff has sustained the loss and loss of use of valuable health care resources

26  impacting Plaintiff and its patient community, and unless and until such sums and property are

27  returned to Plaintiff, Plaintiff's capacity to apply same toward health care services and quality of

28

7

1  care improvement programs for the benefit of Plaintiff's patient community will continue to be

2  impaired thereby.

### FIRST CAUSE OF ACTION

### [Fraud, Against All Defendants]

5       17.    Plaintiff realleges and incorporates by this reference all the allegations of

6  Paragraphs 1 though 16, inclusive, hereinabove, as though set forth here at length.

7       18.    The acts and conduct of the Defendants as hereinabove alleged were done falsely,

8  fraudulently and in order to induce Plaintiff to act in reliance upon the apparent performance,

9  stability and financial strength of Meridian and support and financial strength of the Nautic

10  Defendants, to enable Defendants wrongfully to misappropriate and use to their benefit

11  Plaintiff's funds.

12       19.    Plaintiff justifiably relied upon the acts and conduct of Defendants, and has been

13  proximately damaged thereby in sums not yet fully ascertained but which Plaintiff is informed

14  and believes and on that basis alleges, presently exceed $6,000,000.

15       20.    The acts and conduct of Defendants as set forth above were done with malice,

16  fraud and oppression, and Plaintiff is accordingly entitled to punitive damages in a sum or sums

17  in excess of $10,000,000.00.

### SECOND CAUSE OF ACTION

### [Negligent Misrepresentation, Against All Defendants]

20       21.    Plaintiff realleges and incorporates by this reference all the allegations of

21  Paragraphs 1 though 16 and 18 through 20, inclusive, hereinabove, as though set forth here at

22  length.

23       22.    The representations and acts of the Defendants as set forth hereinabove were

24  made and done without reasonable basis for the truth or accuracy of such representations and

25  with knowledge that such Defendants lacked a reasonable basis therefor.

26  ///

27

28

8

**THIRD CAUSE OF ACTION**

[Conspiracy to Commit Fraud, Against All Defendants]

23.     Plaintiff realleges and incorporates by this reference all the allegations of Paragraphs 1 though 16, 18 through 20 and 22, inclusive, hereinabove, as though set forth here at length.

24.     Beginning in or about October, 2003, the Defendants knowingly and willfully conspired and agreed among themselves to misappropriate funds of Meridian customers, including without limitation Plaintiff, and to conceal from Plaintiff, among others, that such Defendants had caused to be misappropriated and stolen money from customer accounts and falsely to present Meridian, with the support and financial strength of Nautic, as a financially stable business.

25.     Said Defendants did the acts and things herein alleged pursuant to, and in furtherance of, said conspiracy.

26.     Among other overt acts in furtherance of the above-described conspiracy, in or after August, 2005 the Nautic Defendants, among other things, obtained more than $3,750,000 in cash from the sale of their investments in Meridian.

27.     Plaintiff did not become aware of the fraud until in or about December, 2005, and did not become aware of the above-described conspiracy until in or about January, 2006.

**FOURTH CAUSE OF ACTION**

[Conversion, against All Defendants]

28.     Plaintiff realleges and incorporates by this reference all the allegations of Paragraphs 1 though 16, 18 through 20, 22 and 24 through 27, inclusive, hereinabove, as though set forth here at length.

29.     The Defendants, by reason of the acts and conduct as alleged hereinabove, have exercised wrongful dominion and control over property of Plaintiff and unlawfully taken, appropriated and converted property of Plaintiff to their own use and benefit.

///

9

COMPLAINT OF NORTHRIDGE MEDICAL GROUP, INC.

## FIFTH CAUSE OF ACTION

[Unfair and Fraudulent Business Practices, Bus. & Prof. Code §17200 *et seq.*,

Against All Defendants]

30.     Plaintiff realleges and incorporates by this reference all the allegations of Paragraphs 1 though 16, 18 through 20, 22, 24 through 27 and 29, inclusive, hereinabove, as though set forth here at length.

31.     The acts and conduct of the Defendants as alleged above constitute unfair and fraudulent business acts, and the plan, pattern and practice of said Defendants as alleged above, and in which the Nautic Defendants aided and abetted the other Defendants, constitute an unfair and fraudulent business practices, all as prohibited by Cal. Bus. & Prof. Code §§17200 *et seq.* and for which Plaintiff is entitled to equitable relief, including restitution of all sums wrongfully obtained and used for their benefit by Defendants thereby.

## SIXTH CAUSE OF ACTION

[Breach of Contract, Against Meridian]

32.     Plaintiff realleges and incorporates by this reference all the allegations of Paragraphs 1 though 16, inclusive, hereinabove, as though set forth here at length.

33.     The acts and conduct of Meridian as set forth above were in breach of the Northridge MSA.

## SEVENTH CAUSE OF ACTION

[Tortious Inducement to Breach of Contract, Against the Nautic Defendants]

34.     Plaintiff realleges and incorporates by this reference all the allegations of Paragraphs 1 though 16, 18 through 20, 22, 24 through 27, 29 and 31, inclusive, hereinabove, as though set forth here at length.

35.     The acts and conduct of the Nautic Defendants as set forth above were intended to, and were, done with the intent and result of inducing Meridian to breach its obligations to Plaintiff under the Northridge MSA.

///

**10**

COMPLAINT OF NORTHRIDGE MEDICAL GROUP, INC.

## EIGHTH CAUSE OF ACTION

### [Restitution and Imposition of Constructive Trust, Against All Defendants]

36.     Plaintiff realleges and incorporates by this reference all the allegations of Paragraphs 1 though 16, 18 through 20, 22, 24 through 27, 29, 31 and 35, inclusive, hereinabove, as though set forth here at length.

37.     Plaintiff is entitled to restitution from all Defendants of, and /or imposition of a constructive trust upon, any and all property and assets of Plaintiff acquired or used by Defendants thereby, and all proceeds thereof.

## NINTH CAUSE OF ACTION

### [Injunctive and Declaratory Relief, Against All Defendants]

38.     Plaintiff realleges and incorporates by this reference all the allegations of Paragraphs 1 though 16, 18 through 20, 22, 24 through 27, 29, 31, 35 and 37, inclusive, hereinabove, as though set forth here at length.

39.     By reason of the matters alleged above in this Complaint, Defendants, and each of them, and their respective agents, employees and representatives and all persons acting in concert with them, should be enjoined and restrained from interfering with the use and possession by Plaintiff of its property and assets, and from any further efforts to appropriate such property and assets and/or deny Plaintiff the use and benefit of them.  Such injunction is necessary in that Defendants are and if not enjoined will continue to act in violation of the rights of Plaintiff, and unless such an injunction is issued the acts and conduct of Defendants will continue to injure Plaintiff irreparably, as set forth above, for which Plaintiff has no adequate remedy at law.

40.     By reason of the foregoing, there is an actual controversy by and between Plaintiff  on the one hand and Defendants on the other hand, in that, among other things Plaintiff maintains that it is entitled to the possession, use, recovery and benefit of its funds and assets, whereas Defendants have misappropriated and converted same and denied Plaintiff the use thereof; and Plaintiff is informed and believes and on that basis alleges that Defendants continue

**11**

1   to claim that they are entitled to do so and are not liable to Plaintiff thereby.

2       41.   A decree and judgment of this Court is necessary and appropriate to adjudicate

3   the respective rights and obligations as between Plaintiff and Defendants in the premises.

4       WHEREFORE, plaintiff prays for judgment against Defendants, and each of them, as

5   follows:

6       ON THE FIRST THROUGH FOURTH AND SEVENTH CAUSES OF ACTION:  For

7   compensatory damages according to proof but not less than $6,000,000, and for punitive and

8   exemplary damages as determined upon trial of this action but not less than $10,000,000;

9       ON THE FIFTH CAUSE OF ACTION:  For injunctive relief as provided by law, and for

10  full restitution of all sums wrongfully obtained by Defendants and each of them.

11      ON THE SIXTH CAUSE OF ACTION:  For compensatory damages according to proof

12  but not less than $6,000,000;

13      ON THE EIGHTH CAUSE OF ACTION:  For a decree and order of this Court for

14  restitution from all Defendants of, and /or imposition of a constructive trust upon, any and all

15  property and assets of Plaintiff acquired or used by Defendants thereby, and all proceeds thereof;

16      ON THE NINTH CAUSE OF ACTION:  For injunctive relief as provided by law, and

17  for the decree and judgment of this Court adjudicating the rights and obligations of Plaintiff and

18  Defendants in the premises;

19      ON ALL CAUSES OF ACTION:  For prejudgment and postjudgment interest as

20  provided by law, for Plaintiff's attorneys' fees and expenses to the extent provided by law, for

21  costs of suit incurred herein, and for such other and further relief as the Court may deem just and

22  proper.

23

24  Dated: February 14, 2006            UZZELL S. BRANSON III
                                        a Professional Corporation
25                                      LAW OFFICES OF UZZELL. S. BRANSON III

26                                      _____
27                                      Uzzell S. Branson III
                                        Attorney for Plaintiff Northridge Medical
28                                              Group, Inc.

**12**

**EXHIBIT "1"**

# MANAGEMENT SERVICES AGREEMENT

between

## MERIDIAN HEALTH CARE MANAGEMENT

and
Northridge Medical Group, Inc.

a California professional medical corporation

Dated as of July 1, 1999

©1999; All Rights Reserved
MTD3172.MSA

1

*14*

# TABLE OF CONTENTS

Page

RECITALS .................................................................................................. 1

AGREEMENT ............................................................................................. 1

ARTICLE I

### RELATIONSHIP OF THE PARTIES .................................. 2
1.1    Independent Contractors ........................................................ 2
1.2    Control Over Practice of Medicine ....................................... 2
1.3    Representations and Warranties of the Parties ...................... 2

ARTICLE II

### RESPONSIBILITIES OF MHCM ...................................... 3
2.1    Engagement ............................................................................ 3
2.2    Authority of MHCM .............................................................. 3
2.3    Managed Care Contract Negotiations ................................... 3
2.4    Provider Agreements ............................................................. 3
2.5    Utilization and Quality Management ..................................... 4
2.6    Claims Administration ........................................................... 4
2.7    Billing and Collections .......................................................... 5
2.8    General Financial Management ............................................. 5
2.9    Marketing Assistance ............................................................ 5
2.10   Custody of Records ............................................................... 5
2.11   Support Services .................................................................... 5
2.12   Support Personnel ................................................................. 6
2.13   IPA Expenses ......................................................................... 6
2.14   Performance Guarantees ....................................................... 6
2.15   Non-Exclusivity ..................................................................... 6

ARTICLE III

### OBLIGATIONS OF IPA ..................................................... 7
3.1    Organization and Licensure. ................................................. 7
3.2    Medical Services .................................................................... 7
3.3    Practice of Medicine .............................................................. 7
3.4    Standards of Practice and Conduct ....................................... 7
3.5    Terms of Provider Agreements ............................................. 8
3.6    Documentation of Services Performed .................................. 8
3.7    Insurance ................................................................................ 8
3.8    IPA Expenses ......................................................................... 8

©1999; All Rights Reserved
M/D3172.b4SA

2

*15*

3.9     Assistance ........................................................................................ 8
3.10    Corporate Status ............................................................................... 9
3.11    Board of Directors Meetings .............................................................. 9
3.12    Cooperation and Authority ................................................................. 9

ARTICLE IV

                        FINANCIAL ARRANGEMENTS ............................... 9
4.1     Gross  Revenue Defined ...................................................... 9
4.2     Deposit of Gross  Revenue ................................................... 10
4.3     Management Fee .................................................................. 10
4.4     Credentialing Fee ................................................................ 10
4.5     Fee Payment ....................................................................... 10
4.6     Fair Value Warranty ............................................................ 10

ARTICLE V

                        TERM AND TERMINATION ..................................... 10
5.1     Term and Termination Without Cause ................................. 10
5.2     Termination With Cause or Cancellation ............................. 11
5.3     Actions After Termination ................................................... 11

ARTICLE VI

                        INDEMNIFICATION ............................................... 12
6.1     Indemnification by IPA. ...................................................... 12
6.2     Indemnification by MHCM .................................................. 12
6.3     Survival of Obligations ....................................................... 12

ARTICLE VII

                        RESTRICTIVE COVENANTS .................................. 13
7.1     Exclusivity .......................................................................... 13
7.2     Non-Solicitation .................................................................. 13
7.3     Non-Disclosure .................................................................... 13
7.4     Confidentiality of Agreement .............................................. 13
7.5     Reasonableness of Restrictions ........................................... 13
7.6     Severability ......................................................................... 14
7.7     Remedies ............................................................................. 14

®1999; All Rights Reserved
MJD3172.MSA

3

*16*

## ARTICLE VIII

MISCELLANEOUS ............................................... 15

8.1    Taxes and Tax Returns ............................................... 15
8.2    Books and Records ............................................... 15
8.3    Assignment ............................................... 15
8.4    Successor in Interest ............................................... 15
8.5    Modification of Agreement ............................................... 15
8.6    Modification Compelled by Law ............................................... 16
8.7    Waiver; Consents ............................................... 16
8.8    Force Majeure ............................................... 16
8.9    Remedies ............................................... 16
8.10   No Requirement to Refer ............................................... 17
8.11   Headings ............................................... 17
8.12   Notices ............................................... 17
8.13   Non-discrimination ............................................... 18
8.14   Counterparts ............................................... 18
8.15   No Third Party Beneficiary ............................................... 18
8.16   Governing Law ............................................... 18
8.17   Language Construction ............................................... 18
8.18   Dispute Resolution ............................................... 18
8.19   Attorneys' Fees ............................................... 19
8.20   Time is of the Essence ............................................... 19

## EXHIBIT LIST

| | |
|---|---|
| EXHIBIT "A" | Compensation |
| EXHIBIT "B" | Operational Management Services |
| EXHIBIT "C" | Performance |

©1999; All Rights Reserved
MJD3172.MSA

4

17

## MANAGEMENT SERVICES AGREEMENT

This Management Services Agreement ("*Agreement*") is made and entered into as of the ___ day of _____, 1999 (the "*Effective Date*"), by and between Meridian Health Care Management, LP, a Delaware Limited Partnership, ("*MHCM*"), and Northridge Medical Group, a wholly owned subsidiary of Southern California Regional Medical Group, Inc. a California professional medical corporation ("*IPA*"), for the provision of management services by MHCM to IPA. IPA and MHCM are sometimes referred to herein individually as a "*Party*" or collectively as the "*Parties.*"

## RECITALS

A.    IPA is a duly formed and validly existing California professional medical corporation, which has been organized in Los Angeles, California, to operate as an independent practice association, and to enter into agreements with organizations such as health care service plans and other purchasers of pre-paid medical services (hereinafter collectively referred to as "*Plans*") for the arrangement of the provision of health care services to subscribers or enrollees of said Plans (the "*Business*");

B.    IPA has entered or is entering into written agreements with physicians and other health care professionals ("*Providers*") to provide or arrange for the provision of health care services to subscribers or enrollees of Plans ("*Enrollees*") that have or will contract with IPA for health care services;

C.    In addition to providing or arranging for the provision of health care services to subscribers or enrollees of Plans, IPA is expecting to perform a variety of administrative and management services in connection with the provision of health care services to Enrollees of Plans;

D.    MHCM is in the business of providing management and administrative services and has developed operations, management and marketing systems for independent practice associations engaged in providing health care services to Plans;

E.    IPA desires to engage MHCM, and MHCM is willing to provide IPA with the necessary support to manage the Business, all upon the covenants, conditions and restrictions set forth in this Agreement.

©1999; All Rights Reserved
MHCM MSA 7.99

1

*1 8*

## AGREEMENT

NOW, THEREFORE, in consideration of the mutual covenants, conditions and restrictions set forth herein, and for other good and valuable consideration, the receipt and adequacy of which are hereby acknowledged, the Parties agree as follows:

## ARTICLE I
## RELATIONSHIP OF THE PARTIES

**I.1    Independent Contractors.** In performing their obligations hereunder, the Parties shall be and shall act as independent contractors.  MHCM is not a partner, joint venturer, or employee of IPA.  Except as otherwise expressly set forth in this Agreement, neither Party will have the authority to bind the other Party, contractually or otherwise.  In addition, IPA will not have any claim under this Agreement, or otherwise, against MHCM for vacation pay, sick leave, unemployment insurance, worker's compensation, disability benefits or employee benefits of any kind.

**I.2    Control Over Practice of Medicine.** The Parties acknowledge and agree that the physicians who are engaged by IPA (each, a "*Physician*", and, collectively, the "*Physicians*"), shall have exclusive control over the practice of medicine and the delivery of professional medical services to Enrollees, and that all diagnoses, tests, and other professional medical and clinical services shall be undertaken or directly supervised by Physicians and other duly licensed non-physician health care professionals who are engaged by IPA.

**I.3    Representations and Warranties of the Parties.** Each Party represents and warrants as follows:  (i) this Agreement when executed and delivered will constitute the Party's legal, valid and binding obligation enforceable in accordance with its terms, subject to general equitable principles and the laws governing creditors' rights; (ii) the Party has full legal power and authority to enter into and deliver this Agreement and perform the transactions contemplated herein; (iii) all consents, approvals, resolutions, authorizations, actions or orders required of the Party for the authorization, execution and delivery of, and for the consummation of the transactions contemplated by, this Agreement have been obtained; (iv) the execution and delivery of this Agreement, and the performance of its obligations hereunder, do not conflict with or violate any judicial or administrative order, award, judgment or decree applicable to the Party, or violate or conflict with any of the terms, conditions or provisions of the Party's organizational documents or any contract between the Party and any third person or entity.

©1999; All Rights Reserved
MHCM MSA 7.99

2

19

## ARTICLE II
## RESPONSIBILITIES OF MHCM

**II.1    Engagement.**  IPA hereby engages MHCM and MHCM hereby agrees to serve as the sole and exclusive administrator of the Business for those items identified in Exhibit B, commencing as of the Effective Date and subject to the terms and conditions of this Agreement.

**II.2    Authority of MHCM.**  Consistent with the provisions of this Agreement, MHCM shall be responsible for providing such management services as are reasonably necessary, advisable, or proper to conduct the business affairs of the Business.  In carrying out its obligations under this Agreement with respect to the management of the Business, MHCM agrees to provide the services set forth in Exhibit B.  (Exhibit B is attached hereto and hereby incorporated by this reference herein.)  MHCM agrees that it will not, without the prior written consent of IPA, which consent IPA may give or withhold in its sole and complete discretion, do any of the following:  (i) sell, mortgage, pledge, convey, assign, hypothecate, or otherwise transfer any interest in any property of IPA; or (ii) incur debts or enter into contracts, leases, or other agreements in IPA's name except as such obligations are expressly approved in the IPA's annual operating or capital budget or this Agreement.  In the performance of its services hereunder, MHCM shall act at all times in good faith and within reasonable diligence, MHCM shall perform all duties and obligations under this Agreement in a timely manner.  MHCM shall devote the required employees' time as is necessary for MHCM to perform its duties and obligations under this Agreement.

**II.3    Managed Care Contract Negotiation and Implementation.**    IPA shall be responsible for negotiating managed care payor contracts ("Managed Care Contracts").  MHCM shall have the opportunity, prior to execution of any such contract, to review and comment with respect to administrative issues and implementation issues.  IPA shall provide MHCM with copies of each Managed Care Contract.
      (a)    IPA and MHCM shall comply with all terms of each Managed Care Contract including, without limitation, the terms of all documents or instruments incorporated therein by reference and all documents or instruments related thereto.
      (b)    MHCM agrees to provide all management services within its scope of responsibility necessary to implement such Managed Care Contracts or amendments to such Managed Care Contract.

**II.4    Provider Agreements.**  MHCM agrees to assist IPA in the administration of its agreements with Physicians and other providers of health care services ("*Providers*"), including, without limitation, (i) soliciting and negotiation with Providers identified by the IPA as necessary for IPA operations; (ii) assisting in the credentialing of such Providers by providing the Provider's credentialing application and related information to the IPA designated contracted credentialing company or the Plan, as appropriate; (iii) making recommendations regarding the

©1999; All Rights Reserved
MHCM MSA 7.99

3

20

business terms of agreements between IPA and such Providers; (iv) instructing Providers and their office staff regarding established IPA policies and procedures. IPA shall provide MHCM with provider contracting guidelines which shall specify reimbursement rate ranges, reimbursement methodologies and scope of services for each specialty. Any and all Provider agreements are subject to the approval of the Board of Directors of IPA.

Both Parties recognize that the services to be provided by MHCM will be feasible only if IPA operates an active business. Therefore, IPA agrees to obtain and enforce a written Participating Provider Agreement with each current and future Physician who provides professional medical services for IPA (a "*Provider Agreement*"). Each Provider Agreement shall comply with all applicable laws, and shall comply with all provisions of this Agreement, including in particular and without limitation, all provisions of Section III.5. Except with MHCM's prior written consent, IPA agrees not to amend any Provider Agreement if such amendment would cause the Provider Agreement not to be consistent with any provision of this Agreement. If MHCM believes that any particular Provider Agreement should be terminated or that a particular Provider should not be engaged by IPA, and IPA disagrees, then IPA will promptly meet with MHCM in a conscientious and good faith effort to reach an agreement on such question. IPA shall be responsible for funding the payment of compensation for all Providers. MHCM shall have no obligation whatsoever to provide funds for compensating any Provider. MHCM shall reasonably cooperate with and assist IPA to meet its obligations in relations to its Provider Agreements, provided however, that IPA acknowledges and agrees that it shall retain ultimate responsibility for meeting such obligations.

**II.5    Utilization and Quality Management.** MHCM shall provide such utilization and quality management services as are reasonably necessary for the operations of the Business. These services shall include eligibility verification, case management, specialty referral review, claims review, and hospital and utilization tracking and coordination with hospital utilization management and case management staff. All services shall be performed in accordance with written utilization management and quality management policies and procedures developed by IPA in consultation with MHCM.

**II.6    Claims Administration.** MHCM shall have sole and exclusive right and responsibility to administer and pay claims for services rendered to IPA by Physicians and other Providers, including, without limitation, the following: (i) reviewing claims and supporting documentation submitted by Physicians and other Providers; (ii) calculating payable claims based on the IPA and Plan policies and procedures; (iii) billing other payors for coordination of benefits and other third party liability payments according to IPA and Plan policies and procedures; and (iv) preparing and disbursing checks to pay amounts due and owning, subject to prior approval of IPA and the defined disbursement procedures. MHCM shall perform its duties within the time frames established by the Plans, the State of California Department of Corporations and/or HCFA. Failure to perform at this level will constitute a breach of this Agreement.

©1999; All Rights Reserved
MHCM MSA 7.99

4

LI

**II.7    Billing and Collections.**   MHCM shall have sole and exclusive right and responsibility to bill, collect, and receive payments, for medical services rendered by IPA for which IPA does not receive capitation or for services where additional reimbursement is owed to IPA.   This may include, but not be limited to stop loss cases, third party liability cases, and services for which the Plans reimburse IPA on a fee for service basis.  MHCM shall use diligent, good faith efforts to bill and collect such accounts receivable in a timely manner, subject to the receipt by MHCM from IPA, Physicians and other providers, of the billing information as required.

**II.8    General Financial Management.**   MHCM shall provide such financial accounting and record keeping services as are reasonably necessary for the operations of the Business.  These services shall include financial record keeping, accounts receivable and accounts payable processing, bank reconciliation, and preparation of a monthly unaudited financial statements with respect to the operation of the Business (balance sheets and income statements generated in a format agreed upon by IPA and MHCM).  IPA shall be solely responsible for the preparation of all audited financial statements of IPA.  MHCM agrees to assist and coordinate with IPA's certified public accountants, at its sole cost and obligation, the annual review of IPA's books and records and the preparation of compiled or reviewed financial statements, provided, however, that MHCM shall have no responsibility for the preparation of IPA's federal or state income tax returns or the payment of such income taxes.

**II.9    Marketing Assistance.**  MHCM agrees to assist IPA in the development of a marketing plan and related materials for the advertising and marketing of IPA's Business and the services offered by IPA.  In furtherance of the foregoing, MHCM agrees, on behalf of IPA and at IPA's sole expense, to engage appropriate personnel to accomplish this task if such engagement is deemed necessary by IPA.  IPA hereby authorizes MHCM to use IPA's name, address and office location and the respective names, images, qualifications and biographical data of the Physicians in advertising and marketing materials developed by MHCM, or its agents, employees or subcontractors.

**II.10   Custody of Records.**  MHCM shall maintain on behalf of IPA, custody of all records and files relating to the day-to-day operation of the Business, including but not limited to, books of account and financial records, and patient medical records.  Patient medical records shall at all times be and remain the property of IPA and shall be located at the Medical Offices so that they are readily accessible for patient care.  The management of all files and records shall comply with applicable state and federal laws.  MHCM shall use its best efforts to preserve the confidentiality of patient medical records and use information contained in such records only for the limited purposes necessary to perform the services set forth herein.

**II.11   Support Services.**  MHCM agrees, at its cost and expense, to provide or arrange

©1999; All Rights Reserved
MHCM MSA 7.99

5

22

for the provision of all support services as are reasonably necessary for the provision of the services required of MHCM under this Article II (the "*Support Services*"), including but not limited to, computer services, printing, postage and duplication services.

**II.12   Support Personnel.**   MHCM agrees, at its cost and expense, to provide or arrange for the provision of all non-physician personnel as are reasonably necessary for the provision of the services required of MHCM under this Article II (the "*Support Personnel*"). Support Personnel does not include any Providers.  All Support Personnel shall be subject to the supervision, direction and control of MHCM, including, without limitation, (i) hiring any Support Personnel; (ii) determining the salaries, fringe benefits, bonuses, health and disability insurance, workers' compensation insurance and any other benefits that the Support Personnel receive; and (iii) determining any appropriate disciplinary action required to be taken against Support Personnel, up to and including termination.  IPA shall have the right to periodically evaluate any on-site  MHCM personnel and report such evaluations to MHCM.  However, the hiring, compensation and all other terms of employment for all on-site and off-site MHCM personnel shall be at the sole discretion of MHCM.  MHCM agrees to assign an administrator who will be responsible for the day-to-day operations of the IPA and who will be responsive to the Board of Directors of IPA.

**II.13   IPA Expenses.**   Except as otherwise provided in this Agreement, MHCM agrees, at its sole cost and expense, to provide the services set forth in this Article II.  Notwithstanding the foregoing, MHCM shall have no obligation to pay the following expenses incurred by or on behalf of IPA, which shall be the sole and complete responsibility of IPA:  (i) Physician or provider compensation; (ii) expenses for medical offices, facilities, and equipment; (iii) life, malpractice and other insurance expenses; (iv) expenses of attorneys and accountants; (v) IPA Board of Director, committee or medical directorship fees; (vi) costs incurred, with IPA's prior written consent, for IPA's membership, Board, or committee meetings, excluding costs for routine preparation of information packets, presentation materials and other routine materials; (vii) entertainment and travel expenses; (viii) fees relating to professional licensing and Drug Enforcement Administration ("DEA") certification, and other professional licensing, registration and certification requirements; (ix) dues, subscriptions and continuing education expenses; (x) contributions to charitable or other organizations; and (xi) income taxes and preparation of tax returns, (xii) credentialing and provider office site visits.

**II.14   Performance Guarantees.**   MHCM agrees to meet the specific performance standards as described in Exhibit C.

**II.15   Non-Exclusivity.**   IPA acknowledges and agrees that MHCM's obligation to provide management services to IPA as required hereunder is non-exclusive, and that MHCM has the right, without obtaining IPA's prior consent, to make similar arrangements with other physicians, medical groups or independent practice associations ("*Physician Groups*") to provide

©1999; All Rights Reserved
MHCM MSA 7.99

6

2 3

management and administrative services to such other physicians or medical groups.

## ARTICLE III
## OBLIGATIONS OF IPA

**III.1    Organization and Licensure.**  As a continuing condition of MHCM's obligations under this Agreement, IPA and each of its Physicians shall at all times during the term hereof be and remain legally organized and licensed to provide professional medical services in accordance with all requirements of applicable state and federal laws and regulations.

**III.2    Medical Services.**  IPA agrees to provide professional medical services to patients of the Business at all times in accordance with requirements of professional services agreements between IPA and each Plan, and in accordance with this Agreement ("*Medical Services*").  IPA further agrees as an essential term of this Agreement to undertake to provide Medical Services in a cost-effective manner consistent with accepted utilization review and quality assurance practices prevailing in the IPA's service area.

**III.3    Practice of Medicine.**  IPA shall be solely and exclusively responsible for supervising, directing and controlling all aspects of the practice of medicine and the provision of medical care and services to Enrollees, including, without limitation, diagnosis, treatment, prescription and administration of medicine and drugs, the preparation of medical records and reports, and the training of Physicians and other Providers, and the compliance of Physicians and other Providers with the utilization management and quality management policies and procedures of IPA.  MHCM shall neither have nor exercise any control or direction over the methods by which IPA or any Physicians practice medicine.

**III.4    Standards of Practice and Conduct.**  IPA agrees that all medical services provided by IPA, and each Physician and Provider, shall be consistent with the applicable professional standards of the American Medical Association, the applicable law of the State of California, and the prevailing community standards of care in the Los Angeles area, and federal laws and regulations (including specifically those related to the Medicare and Medi-Cal programs). IPA shall take all steps necessary to ensure that it and each of its Physicians remain in good standing as a provider under the Medicare and Medi-Cal programs, as appropriate.  IPA shall take all steps necessary to ensure that Physicians remain duly licensed to practice medicine in the State of California and maintain unrestricted prescription authority from the DEA.  IPA shall take all steps necessary to ensure that all Providers are qualified and licensed to perform the services for which they are contracted pursuant to applicable law and/or professional standards. IPA shall maintain utilization management and quality management programs as established from time to time by IPA in consultation with MHCM, or as mandated by accreditation and/or licensing standards applicable to the Business, and shall ensure that each of its contracting Physicians participates in such continuing medical education as is necessary for such person to

©1999: All Rights Reserved
MHCM MSA 7.99

7

24

maintain adequate professional skills and expertise. IPA acknowledges and agrees that it is solely responsible for making all reports, if any, required to be made to the Medical Board of California under Section 805 of the California Business and Professions Code, or to the National Practitioner Data Bank.

**III.5    Terms of Provider Agreements.**    Each Provider Agreement shall require the Provider: (i) to maintain a current unrestricted licenses to practice their respective professions in the State of California; (ii) to maintain a current unrestricted certification by the Federal Drug Enforcement Administration ("DEA"); (iii) to maintain professional liability insurance covering all activities by such Provider consistent with the terms of Section 3.8 below; (iv) for Physician Providers, to maintain appropriate medical staff membership and clinical privileges at hospitals to the extent necessary for the provision of professional medical services to Enrollees of Plans; and (v) to maintain the confidentiality of IPA's information and the Confidential Information of MHCM, pursuant to terms consistent with Section VII.3 of this Agreement.   IPA agrees to establish procedures to ensure that Providers and Provider Agreements meet these requirements on an ongoing basis.   IPA further agrees to use commercially reasonable efforts to enforce the covenants made by Providers in any Provider Agreement.

**III.6    Documentation of Services Performed.**    IPA and Physicians shall be solely responsible for recording and collecting proper encounter data, including, without limitation, coding and recordation of all medical services and all other health care services provided by any of the Physicians or other IPA providers to Enrollees.   IPA agrees to furnish or cause to be furnished to MHCM, all encounter data and information required by MHCM to properly report such information to Plans or to bill and collect  for medical services provided in accordance to Section II.7.   Such information shall be submitted in a format agreed upon by the Parties.

**III.7    Insurance.**    Each party covenants and agrees that it shall obtain and maintain in effect throughout the initial term of this Agreement and each renewal term thereof, as appropriate, such policies of comprehensive general liability insurance and professional liability insurance including, but not limited to Directors & Officers and Errors & Omissions policies as well as comprehensive general liability insurance, as appropropriate.

**III.8    IPA Expenses.**    IPA shall be responsible for any and all expenses incurred by or on behalf of IPA other than those expenses for which responsibility has been expressly assumed by MHCM hereunder, including, without limitation, all expense items identified in Section II.13. Nothing in this Agreement shall preclude IPA from purchasing from MHCM any items or services which otherwise are not provided by MHCM pursuant to this Agreement.

**III.9    Assistance.**    IPA agrees to cooperate with and assist MHCM, and to execute such other documents and take such other actions as may be reasonably necessary or desirable, in

©1999; All Rights Reserved
MHCM MSA 7.99

8

25

connection with the efficient management of the Business.

**III.10  Corporate Status.**   IPA covenants and agrees that it is presently and shall remain through the term of this Agreement, a professional corporation in good standing with the California Secretary of State.

**III.11  Board of Directors Meetings.**      IPA shall hold regular Board of Directors meetings.

**III.12  Cooperation and Authority.**  IPA covenants and agrees that it shall provide MHCM with all information and the use of such facilities as is reasonably required by MHCM to perform its services hereunder.  IPA further covenants that it shall grant MHCM such authority as may be necessary or desirable to ensure MHCM's ability to perform its duties hereunder. Such authority shall include access to individual provider offices, as approved by IPA.


### ARTICLE IV
### FINANCIAL ARRANGEMENTS

**IV.1  Gross Revenue Defined.**  For purposes of this Agreement, IPA's "*Gross Revenue*" shall mean and include all payments owing to IPA for the provision of medical services to Enrollees, in accordance with generally accepted accounting principles, adjusted to reflect contractual allowances and other normal deductions from revenue, including such deductions mutually agreed upon by the Parties for charity care, bad debts and other amounts deemed uncollectible.  Without limiting the generality of the foregoing, IPA's Gross Revenue shall include, or exclude as appropriate, all revenue described in each of the following categories:

(a)      Gross Revenue shall include  capitation revenue ( defined as revenue where payment for services provided by IPA is made to IPA periodically on a per member per month basis, percentage of premium basis or any other basis  as defined by the Plan agreement) net of contractual deductions (such as withholds or POS deductions but excluding claims, except in those instances where the claim has not previously processed by MHCM), reinsurance, third party liability recoveries, stop loss recoveries, coordination of benefits, and risk pool disbursements.  In the event that the Plan takes over claims processing and payment activities that were the responsibility of MHCM through this Agreement, Gross Revenue will be adjusted to reflect the deductions taken by the Plan to perform these functions.  Such deductions shall include deductions in capitation that the IPA receives from the Plan as well as penalty amounts  that the Plan may levy against the IPA for failure to perform functions that are the responsibility of MHCM under this Agreement.

(b)      Gross revenue shall not include:  (i) expert witness fees or speaking honoraria received by individual Physicians; (ii) medical directorship fees received by individual

©1999; All Rights Reserved
MHCM MSA 7.99

9

26

physicians.

**IV.2    Deposit of Gross Revenue.**  IPA shall establish a bank account (the *"General Account"*), to be maintained by MHCM at such bank or similar financial institution as IPA and MHCM may from time to time agree (the *"Bank"*), and all Gross Revenue collected by MHCM pursuant to this Agreement shall be deposited therein. IPA agrees to account for and deliver to MHCM for deposit into the General Account, any and all Gross Revenue collected or received by IPA during the term of this Agreement. The General Account shall be used solely for depositing funds collected by MHCM or IPA and disbursing such funds in accordance with this Agreement.

**IV.3    Management Fee.**  As compensation for the performance by MHCM of its obligations hereunder, IPA agrees to pay MHCM in accordance to those amounts identified in Exhibit A.

**IV.4    Credentialing Fee.**  Credentialing is not MHCM's responsibility under this Agreement.

**IV.5    Fee Payment.**  Within thirty (30) days of IPA's receipt of MHCM's invoice for services, IPA shall pay to MHCM the Management Fee for such month. MHCM agrees that the payment of such amounts by IPA shall constitute full and complete compensation to MHCM for all of MHCM's obligations and services rendered to IPA pursuant to this Agreement.

**IV.6    Fair Value Warranty.**  Each Party represents and warrants on behalf of itself, that the aggregate benefit given or received under this Agreement has been determined in advance through a process of arms-length negotiations that were intended to achieve an exchange of goods and/or services consistent with fair market value under the circumstances, and that any benefit given or received under this Agreement is not intended to induce, does not require, and is not contingent upon, the admission, recommendation or referral of any patient, directly or indirectly, to the MHCM, or to IPA, and further, is not determined in any manner that takes into account the value of business generated between the parties.

## ARTICLE V
## TERM AND TERMINATION

**V.1    Term and Termination Without Cause.**  Unless earlier terminated pursuant to the terms of either Section V.2 or V.3 below, or pursuant to any other provision of this Agreement, the term of this Agreement shall commence on July 1, 1999, and shall extend for a period of three (3) years thereafter. At the expiration of the initial term, this Agreement shall automatically extend for successive terms of two (2) years each, unless either Party gives to the

©1999; All Rights Reserved
MHCM MSA 7.99

10

27

38

other Party written notice of termination without cause at least four (4) months prior to the expiration of the then current term.

**V.2    Termination With Cause Or Cancellation.** Notwithstanding the foregoing, this Agreement may be terminated or canceled by either Party (non-defaulting Party) giving thirty (30) days prior written notice to the other Party if the other Party is in default of this Agreement. The following shall constitute events of default:

(a)    Failure by either Party to perform, keep or fulfill any material covenant, undertaking, obligation, condition or service set forth in this Agreement, including those Services and Performance Guidelines specifically set forth in Exhibits B and C, provided such failure is not cured within a period of thirty (30) days after receipt of written notice of such failure by the defaulting party.

(b)    Failure of a Party to pay any amount which may become due hereunder for a period of thirty (30) days after written notice of such failure.

(c)    Cancellation of insurance required by either Party herein.

(d)    IPA's practice of medicine is deemed illegal by any state or federal agency.

(e)    Any representations or warranties made herein by either Party are intentionally falsified or incorrect as of the effective date of this Agreement.

(f)    Either Party filing involuntary bankruptcy or an assigning of a majority of its assets for the benefit of creditors, or upon other action taken or suffered, voluntarily or involuntarily, under any federal or state law for the benefit of debtors of such Party, except for the filing of a petition of involuntary bankruptcy which is dismissed within sixty (60) days thereafter.

**V.3    Actions After Termination.** Upon the expiration or earlier termination of this Agreement, the following shall apply:

(a)    MHCM shall be paid in accordance with Article IV hereof for all agreed services rendered by MHCM to IPA prior to the expiration or earlier termination of this Agreement;

(b)    upon request of IPA, MHCM shall continue to provide claims administration for IBNR claims against a reserve account established by IPA, without additional cost or charge to the IPA, for a period of sixty (60) days following the date of termination (it being understood that all funds in the reserve account are the property of IPA and will be disbursed in accordance with this Agreement), and at the expiration of such sixty (60) day period, MHCM shall deliver to IPA a final statement of reserve account funds and IBNR claims for IPA;

(c)    MHCM further agrees that upon request by IPA, MHCM shall continue to provide claims administration for IBNR claims against a reserve account established by the IPA, on a monthly basis for a period not to exceed six (6) months following the expiration or termination of this Agreement, in exchange for the payment by IPA to MHCM of five dollars ($5.00) per adjudicated and paid claim, beginning with the sixty-first (61st) day following the date

©1999; All Rights Reserved
MHCM MSA 7.99

11

28

of termination of this Agreement, and MHCM shall deliver to IPA a monthly statement of reserve account funds and IBNR claims for IPA, as well as a final statement of reserve account funds and IBNR claims for IPA as of the date of termination;

(d)      upon termination of the period set forth in subparagraph (b) or (c) above, whichever is applicable, MHCM shall remit to IPA all reserve account funds that remain following administration by MHCM of IBNR claims; and

(e)      in effectuating the foregoing provisions, IPA agrees that for the applicable period following the expiration or earlier termination of this Agreement, the IPA Account and General Account (and related Depository Agreements) shall be maintained, it being understood that funds in the reserve account will be disbursed in accordance with this section.

## ARTICLE VI
## INDEMNIFICATION

**VI.1   Indemnification by IPA.**  IPA hereby agrees to indemnify, defend, and hold harmless MHCM, and each of MHCM's officers, directors, shareholders, agents and employees, from and against any and all claims, demands, losses, liabilities, actions, lawsuits and other proceedings, judgments and awards, and costs and expenses (including reasonable attorneys' fees), arising directly or indirectly, in whole or in part, out of any matter related to (i) the professional negligence of IPA or any professional acts or omissions of IPA to the extent that such is not paid or covered by the proceeds of insurance; and (ii) any breach by IPA in the performance of its obligations under this Agreement.  IPA shall immediately notify MHCM of any lawsuits or actions, or any threat thereof, that may become known to IPA that might adversely affect any interest of IPA or MHCM whatsoever.

**VI.2   Indemnification by MHCM.**  MHCM hereby agrees to indemnify, defend, and hold harmless IPA, and each of IPA's officers, MHCM's, members, agents and employees, from and against any and all claims, demands, losses, liabilities, actions, lawsuits and other proceedings, judgments and awards, and costs and expenses (including reasonable attorneys' fees), arising directly or indirectly, in whole or in part, out of any matter related to any breach by MHCM of this Agreement or any acts or omissions by MHCM in its performance of this Agreement, including but not limited to the negligence of MHCM, to the extent that such is not paid or covered by the proceeds of insurance.  Notwithstanding the foregoing, MHCM shall not indemnify IPA for the acts, or failure to act, by Clinicians or Support Personnel who perform services under the direct supervision or control of any Physician at the Business.  MHCM shall immediately notify IPA of any lawsuits or actions, or any threat thereof, that may become known to MHCM that might adversely affect any interest of MHCM or IPA whatsoever.

**VI.3   Survival of Obligations.**  The obligations set forth in this Article VI shall survive the expiration or termination of this Agreement.

©1999; All Rights Reserved
MHCM MSA 7.99

12

29

## ARTICLE VII
## RESTRICTIVE COVENANTS

**VII.1  Exclusivity.** During the term of this Agreement and except as otherwise provided herein, IPA will use MHCM exclusively for all administrative services as required for the day-to-day operations of IPA as defined in Exhibit "B" of this Agreement.

It is furthered agreed and understood that prior to entering into an agreement with any other qualified agency, for the purpose of obtaining additional administrative services, other than the specific functions that are set forth in this Agreement, IPA will notify MHCM of such intent, in writing, and MHCM will have the right of refusal to provide these additional services, at additional compensation no less than the compensation proposed to IPA in any bona fide offer from a qualified third Party. Such right of first refusal shall expire thirty (30) days after IPA presents to MHCM a bona fide offer from a third Party qualified to provide such additional services.

**VII.2  Non-Solicitation.** The parties agree that during the term of this Agreement and for a period of one year following termination of this Agreement, neither Party will directly or indirectly solicit any employee of the other to accept employment with that Party.

**VII.3  Non-Disclosure.** At no time during or after the termination of this Agreement shall IPA, its partners, shareholders of partners, employees, or independent contractors, disclose, communicate or divulge to, or use for the direct or indirect benefit of any person, firm, association or company any material referred to in this Section VII.3, or any information regarding the business methods, business policies, procedures, techniques, or trade secrets, or other knowledge or processes of or developed by MHCM, or any other confidential information relating to or dealing with the business operations or activities of MHCM, made known to IPA, its shareholders, employees or agents or learned or acquired by IPA, its shareholders, employees or agents during the term of this Agreement, (collectively, "*Company Information*") except as may be expressly authorized by MHCM or any successor to it.  Immediately upon the termination of this Agreement, IPA and/or the applicable shareholder, physician employee or independent contractor, or other key employee or independent contractor shall deliver to MHCM all documents, computer discs or other forms of recorded information, including all copies thereof, containing Company Information.

**VII.4  Confidentiality of Agreement.** IPA and MHCM acknowledge and agree that this Agreement, and the terms and conditions set forth herein, are confidential. Each Party on behalf of itself, its agents and employees, covenants and agrees not to disclose directly or indirectly the terms of this Agreement, whether in whole or in part, to any third person or entity, except when necessary for the performance of this Agreement (*e.g.*, to MHCM's assignees), or required by

©1999; All Rights Reserved
MHCM MSA 7.99

13

*30*

law, or for the sole purpose of securing legal counsel with respect hereto. In addition, each Party further agrees not to disclose to any third party any financial or other information regarding the other Party obtained by the disclosing Party under this Agreement, regardless of when obtained, without the prior written consent of the other Party, except when necessary for the performance of this Agreement (e.g., to MHCM's assignees), or when required by law, or for the sole purpose of securing legal counsel with respect hereto.

**VII.5  Reasonableness of Restrictions.**  The parties hereto acknowledge that the restrictions contained in this Article VII are reasonable and necessary to protect the legitimate interests of MHCM and IPA and that any violation of these restrictions would result in irreparable injury to MHCM and IPA. If the period of time, geographical area or scope of restricted activities or items specified in this Article VII should be adjudged unreasonable in any judicial, or any state or professional regulatory, proceeding, then the period of time or geographical area or scope shall be reduced to whatever extent the applicable authority deems to be reasonable. In the event of a violation of these restrictions, the duration of the restrictions referred to in this Article VII shall be extended by a period of time equal to that period beginning with the commencement of any such violation and ending when such violation shall have been finally terminated in good faith.

**VII.6  Severability.** If any provisions of this Article VII shall be determined to be invalid or unenforceable, either in whole or in part, this Article VII shall be deemed amended to delete or modify, as necessary, the offending provisions and to alter the balance of this Article VII in order to render the same valid and enforceable to the fullest extent permissible, as aforesaid. Additionally, the provisions of this Article VII shall be deemed to be valid to the extent of any lesser area or for any lesser duration permitted by law if the area and duration set forth herein is deemed to be too broad by a court of competent jurisdiction. The provisions of this Article VII shall be construed as an agreement independent of the other provisions of this Agreement. The existence of any claim or cause of action by either Party against the other Party shall not constitute a defense to the enforcement by either Party of the provisions of this Article VII.

**VII.7  Remedies.**  The Parties acknowledge that the forgoing restrictions are reasonable and necessary to protect the legitimate interests of the respective Parties and that the Parties would not have entered into this Agreement without the restrictive covenants contained herein, that the violation of these covenants will result in irreparable injury to the affected Party, that the remedy at law for any such violation or threatened violation would be inadequate and that in the event of any such breach or violation, the injured Party, in addition to any other remedies or damages available to it, shall be entitled to injunctive or other equitable relief without the necessity of proving actual damages but such rights to relief shall not preclude the injured Party from other remedies which may be available to it hereunder.

©1999; All Rights Reserved
MHCM MSA 7.99

14

71

## ARTICLE VIII
## MISCELLANEOUS

**VIII.1 Taxes and Tax Returns.**  MHCM shall be responsible for all federal, state and local taxes and contributions with respect to MHCM and persons employed by it, and MHCM shall make all returns and/or reports required in connection with any and all such laws, regulations, taxes, contributions, and benefits.  IPA shall be responsible for all federal, state and local taxes and contributions with respect to IPA and persons employed by it, and IPA shall make all returns and/or reports required in connection with any and all such laws, regulations, taxes, contributions, and benefits.  MHCM agrees to provide IPA with such financial and accounting information in the possession of MHCM in order to assist IPA in the preparation of its income tax returns, provided, however, that MHCM shall have no obligation or responsibility whatsoever to provide IPA with either tax returns or tax advice.

**VIII.2 Books and Records.**  All documents and materials including all patient charts and files, records, contracts, and other papers or documents which pertain to the Business, shall be the sole and exclusive property of IPA, provided that MHCM, at its expense, shall be entitled to retain copies of any and all such materials.  During the term of this Agreement IPA, or its respective designees, shall have reasonable access during normal business hours upon reasonable request, for inspection and copying of records maintained by MHCM in conjunction with MHCM's performance hereunder.  Notwithstanding the foregoing, IPA shall have no right to inspect or copy business or financial records of MHCM that relate solely to MHCM, or that are not generated in the ordinary course of performance by MHCM of its obligations hereunder.

**VIII.3 Assignment.**  This Agreement, being intended to secure the services of MHCM, its agents, employees and representatives, shall not be assigned, sublet or transferred by MHCM without prior written consent of IPA.  Such consent shall not be unreasonably withheld.  This Agreement shall inure to the benefit of and be binding on IPA and MHCM, their executors and administrators, including any person or entity which affiliates, merges or acquires substantially all of the assets of IPA or MHCM, or into which IPA may be consolidated or otherwise combined.

**VIII.4 Successor in Interest.**  Subject to Section VIII.3, all of the rights, benefits, duties, liabilities, and obligations of the parties hereto shall inure to the benefit of and be binding upon the parties and their permitted successors and assigns.

**VIII.5 Modification of Agreement.**  This Agreement supersedes any and all agreements, either written or oral, between the Parties, and contains all of the covenants and agreements between the Parties with respect to the subject matter hereof.  All Exhibits referred to in this Agreement are intended to and shall be incorporated into this Agreement by reference and shall be deemed to be a part of this Agreement.  Each Party to this Agreement acknowledges that no

©1999; All Rights Reserved
MHCM MSA 7.99

15

?).

representations, inducements, promises, or agreements, oral or otherwise, have been made by either Party, or anyone acting on behalf of either Party, which are not embodied herein, and that no other agreement, statement, or promise not contained in this Agreement shall be valid or binding. This Agreement may not be modified or amended except by a written document executed by both Parties.

**VIII.6 Modification Compelled by Law.** In the event any existing state or federal law or regulation is interpreted by a judicial decision or by a regulatory agency, or any new state or federal law or regulation is enacted, so as to indicate that any provision of this Agreement may be in violation of any such law or regulation or interpretation thereof, IPA and MHCM promptly shall make diligent and good faith efforts to amend this Agreement as necessary to accommodate the law or regulation or interpretation thereof. To the maximum extent possible, any such amendment shall preserve the underlying economic and financial arrangements between IPA and MHCM. In the event that the necessary modifications cannot be agreed upon by the Parties within thirty (30) days of one Party's written request of the other to negotiate such modification, this Agreement may be terminated by either Party, upon thirty (30) days prior written notice to the other Party.

**VIII.7 Waiver; Consents.** No consent or waiver, express or implied, by either Party hereto shall be valid unless set forth in a written document executed by both Parties, and no such consent or waiver shall be deemed or construed to be a consent to or waiver of any other obligation of a Party hereunder. Failure on the part of either Party to complain of any act or failure to act of the other Party or to declare the other Party in default, irrespective of how long such failure continues, shall not constitute a waiver by such Party of its rights hereunder. The granting of any consent or approval in any other instance by or on behalf of IPA and/or MHCM shall not be construed to waive or limit the need for such consent in any other or subsequent instance.

**VIII.8 Force Majeure.** Either Party shall be excused for failures and delays in performance of its respective obligations under this Agreement due to any cause beyond the control and without the fault of such Party, including without limitation, any act of God, war, riot or insurrection, law or regulation, strike, flood, fire, explosion or inability due to any of the aforementioned causes to obtain necessary labor, materials or facilities, for so long as such event continues, and for a reasonable period of time thereafter. This provision shall not, however, release such Party from using its best efforts to avoid or remove such cause and such Party shall continue performance hereunder with the utmost dispatch whenever such causes are removed. Upon claiming any such excuse or delay for non-performance, such Party shall give prompt written notice thereof to the other Party, provided that failure to give such notice shall not in any way limit the operation of this provision.

**VIII.9 Remedies.** All rights, powers and remedies granted to either Party by any

©1999; All Rights Reserved
MHCM MSA 7.99

16

33

particular term of this Agreement are in addition to, and not in limitation of, any rights, powers or remedies which it has under any other term of this Agreement, at common law, in equity, by statute, or otherwise. All such rights powers and remedies may be exercised separately or concurrently, in such order and as often as may be deemed expedient by either Party. No delay or omission by either Party to exercise any right, power or remedy shall impair such right, power or remedy or be construed to be a waiver of or an acquiescence to any breach or default. A waiver by either Party of any breach or default hereunder shall not constitute a waiver of any subsequent breach or default.

**VIII.10    No Requirement to Refer.**   No provision of this Agreement, or the relationship between the parties created by this Agreement, is intended by the parties hereto to include an agreement or requirement that IPA or its Physicians utilize the services or otherwise direct the patients to facilities owned or operated by MHCM or its affiliates or as an inducement to IPA or its Physicians to make any such referral. The parties hereto agree that the benefits under this Agreement do not require, are not payment for, and are not in any way contingent upon the admission, referral or other arrangement for the provision of any item or service reimbursed under Medicare or Medi-Cal.

**VIII.11    Headings.**   The headings of the Sections and Articles of this Agreement are inserted for convenience of reference only and shall not in any manner affect the construction or meaning of anything herein contained or govern the rights or liabilities of the parties hereto.

**VIII.12    Notices.**   All notices, requests, and communications required or permitted hereunder shall be in writing and shall be sufficiently given and deemed to have been received upon personal delivery or delivery by overnight courier or, if mailed, upon the first to occur of actual receipt or seventy-two (72) hours after being placed in the United States mail, postage prepaid, registered or certified mail, receipt requested, addressed to the parties as follows:

|  |  |
|---|---|
| If to IPA: | Northridge Medical Group, Inc,<br>18350 Roscoe Blvd., Suite 700<br>Northridge, CA 91325<br>Attention: President |
| If to MHCM: | Meridian Health Care Management, LP<br>21045 Califa St.<br>Woodland Hills, CA 91367<br>Attention: President |

Notice of a change in address of one of the parties shall be given in writing to the other Party as provided above, but shall be effective only upon actual receipt.

©1999; All Rights Reserved
MHCM MSA 7.99

17

2u

45

**VIII.13    Non-discrimination.**  IPA and MHCM will not discriminate on the basis of race, sex, age, religion, national origin, or handicap in providing services under this Agreement or in the selection of employees or independent contractors.

**VIII.14    Counterparts.**  This Agreement may be executed in exact counterparts and when so executed by the parties hereto shall be effective in accordance with the terms hereof.

**VIII.15    No Third Party Beneficiary.**  None of the provisions herein contained are intended by the parties, nor shall they be deemed, to confer any benefit on any person not a Party to this Agreement.

**VIII.16    Governing Law.**  This Agreement shall be governed by the laws of the State of California.

**VIII.17    Language Construction.**  The language in all parts of this Agreement shall be construed, in all cases, according to its fair meaning, and not for or against either Party.  Any rule of law, or any legal decision that would require interpretation of any claimed ambiguities in this Agreement against the Party that drafted it has no application and is expressly waived.

**VIII.18    Dispute Resolution.**  In the event of a dispute between the Parties to this Agreement, the Parties agree that the following procedure will be used in an attempt to resolve the dispute prior to the pursuit by any Party of other available remedies:

(a)    A meeting (the "Initial Meeting") shall promptly be held at which all Parties are present or represented by individuals with full decision making authority regarding the matters in dispute.

(b)    If within thirty (30) days following the Initial Meeting the Parties have not succeeded in negotiating a resolution of the dispute, the dispute shall be submitted to mediation facilitated by a mediator ("Mediator").  Such Mediator shall be a retired judge or mature practicing attorney with experience relevant to this Agreement.  Each Party shall bear its proportionate share of the costs of the mediation, including the Mediator's fee.

(c)    The Parties agree to participate in good faith in the mediation and negotiations related thereto in the Initial Meeting and in all mediation conferences.

(d)    If within a period of sixty (60) days following the mediation conference or any adjournment thereof, the parties are unable to resolve the dispute, the Parties agree to submit such dispute to Arbitration.  Such arbitration shall be settled in accordance with the rules of commercial arbitration of the American Arbitration Association and judgment upon the award rendered by the arbitrator(s) may be entered in any court having jurisdiction thereof.  Such arbitration shall occur within the County in which MHCM offices are located, unless the parties mutually agree to have such proceeding in some other locale.  The arbitrator(s) may in any such proceeding award attorneys' fee and costs to the prevailing Party.

©1999; All Rights Reserved
MHCM MSA 7.99

18

35

**VIII.19**        **Attorneys' Fees.**  If legal action is commenced by either Party to enforce or defend its rights under this Agreement, or to interpret or enforce this Agreement, the prevailing Party in such action shall be entitled to recover its costs and reasonable attorneys' fees from the other Party, in addition to any other relief granted.

**VIII.20**        **Time is of the Essence.**  Time is hereby expressly declared to be of the essence in this Agreement.

IN WITNESS WHEREOF, the parties have hereunto set their hand as of the day and year first above written.

"MHCM"                                        "IPA"

Meridian Health Care Management, A           Northridge Medical Group, Inc.
Delaware Limited Partnership.                 a California professional
By Meridian Health Care Consulting Inc,. A    medical corporation
California Corporation, its General Partner.

By: _____                   By: _____

Its:    President                             Its:    President

Date:   8/3/99                                Date:   7/30/99

©1999; All Rights Reserved
MHCM MSA 7.99

19

36

# EXHIBIT "A"

## COMPENSATION

**MHCM shall be compensated as follows:**

**A.**    For development, and initial set-up: to include implementation services, initial information system set-up, loading into MHCM information system of all IPA provider files, member eligibility files, contract benefit tables and fee schedules via electronic or magnetic media, and recruitment and training of all MHCM staff necessary to support MHCM's responsibilities hereunder, team meetings with IPA, development activities, as requested, IPA shall pay MHCM the following:

> IPA shall pay MHCM a payment of Forty Thousand dollars ($40,000.00) in accordance to the following schedule:
>
> - 33.3% ($13,500) upon signature of this Agreement.
> - 33.3% ($13,500) on the date the first Plan agreement between IPA and Plan becomes effective (expected to be August 1, 1999).
> - 33.3% ($13,000) upon successful completion of the implementation of this Agreement (see Exhibit C for definition).

**B.**    In addition to any fees paid to MHCM under Section A of this Exhibit, commencing immediately on the date that MHCM begins to perform any of the services described in Exhibit "B" of this Agreement, which date is expected to be August 1, 1999, IPA shall remit to MHCM, within thirty (30) days of IPA's receipt of MHCM's invoice for services, a monthly payment equal to **11.5%** of Gross Revenue, as defined in Article IV.1(a) of this Management Services Agreement.

**C.**    Notwithstanding Section B of this Exhibit, the monthly fee paid to MHCM for providing management services as described in Exhibit "B" hereof shall be a minimum of $10,000 Thousand dollars per month, effective October 1, 1999.

©1999; All Rights Reserved
MHCM MSA 7.99

7

23

D.     All expenses directly related to the performance of services under Article II and Exhibit "B" of this Management Services Agreement shall be borne by MHCM, excluding the following:

- IPA legal expenses.
- Accounting expenses for year end taxes, audits and special accounting services other than the day-to-day operation of IPA.
- IPA Board, committee and Medical Director fees
- Design, printing and duplication expenses for medical encounter and referral forms, IPA stationery, newsletters and other marketing materials.
- IPA insurance premiums, including but not limited to: reinsurance, directors and officers, professional or general liability, and as approved by IPA.
- Costs incurred, with prior approval of IPA, for IPA's membership, Board or committee meetings, excluding costs for routine preparation of information packets, presentation materials and other routine items.
- Space rent, furnishings and equipment for office space located within IPA's primary service area (as defined in Article III, Section B of this Agreement) and used by MHCM, with IPA's approval, to perform the services required under this Agreement.

E.     For additional services not included in Exhibit "B", but requested and approved by IPA, MHCM shall be paid as follows:

$235.00 per hour    Executive level staff
$160.00 per hour    Director or management  staff
$ 50.00 per hour    Support Staff

In additional to these hourly rates: IPA agrees to reimburse MHCM, with IPA's prior approval, and upon receipt of appropriate invoice and documentation, for all reasonable travel (excepting travel between the offices of MHCM and IPA), hotel, postage, copying and other out-of-pocket expenses. All such expenses shall be billed at MHCM's cost.

©1999: All Rights Reserved
MHCM MSA 7.99

2

28

**EXHIBIT "B"**
## OPERATIONAL MANAGEMENT SERVICES TO BE PROVIDED BY MHCM

### A. General Management and Administration.

1. Supervising and coordinating day-to-day non-medical business aspects of IPA.
2. Providing administrative support for interface with physicians, including voice mail access to MHCM staff at any time. Making best efforts to return as quickly as possible IPA voice mail messages, including voce mail messages received outside of normal business hours.
3. Providing the services of a consulting Medical Director who shall assist IPA in the provision of medical, administrative, peer review and utilization management services to IPA, including, but not limited to:
4. Consulting on Payor/IPA communications pertinent to medical matters.
5. Assisting in resolving any grievances between IPA and Payors pertinent to all medical matters.
6. Consulting on resolving IPA/Payor Member grievances pertinent to medical matters.
7. Consulting on IPA's medical and hospital referral authorization procedures.
8. Interfacing with IPA provider's office staff to monitor IPA's medical and hospital referral authorization procedures.
9. Coordinating medical administrative support prior to and at all Utilization Management and Quality Management Committee Meetings.
10. Providing clerical and secretarial support adequate to meet functions of IPA, its employees and its Board of Directors.
11. Coordinating printing of all forms and correspondence.
12. Processing all incoming and outgoing mail.
13. Maintaining a liaison with Payors where necessary to obtain/submit data, etc.
14. Preparing ad-hoc reports as requested by IPA.
15. On-going provision of computerized management information system.
16. Display capability of the software and up to five days of system training
17. Encounter receipt and processing in accordance with Health Plan requirements
18. Purchased service claim receipt and processing

### B. Financial Management.

1 Establishing bookkeeping and accounting systems including the maintenance, custody and supervision of all of IPA's business records and the preparation, distribution and recordation of all bills and statements for professional services rendered by IPA, including billing and completion of reports and forms required by prepaid health plans, employers, insurance companies, governmental agencies and other third party payors.

©1999; All Rights Reserved
MHCM MSA 7.99

3

29

2  Establishing an annual budget that reflects major operating objectives and anticipated revenues, expenses and cash flow.

3  Maintain bank accounts and supervise short term investments and money management.

4  Preparing financial statements on a monthly basis to include a balance sheet, statement of revenue and expenses, and cash flow for IPA's operations for such month and a statement of accounts receivable. Such statements to be produced on both a cash and accrual basis of accounting.

5  Establishing and maintaining an accounts payable system.

6  Administering a claims processing system, including, but not limited to:
   a  Receiving completed claim forms from IPA providers.
   b  Entering data in computerized database.
   c  Generating reports required by Payors.
   d  Adjudicating and paying claims pursuant to IPA's instructions and policies.
   e  Reviewing available cash versus payable claims.
   f  Generating reports required by IPA for utilization management and financial review.

7  Administering capitation distribution from prepaid Payors, including but not limited to:
   a  Receiving and depositing capitation payments.
   b  Reconciling capitation payments with eligibility lists and other pertinent reports.
   c  Preparing budgets for internal IPA management.
   d  Distributing primary care physician ("PCP") capitation payments and explanation of benefits.

8.  Distributing specialty physician payment based upon authorized referrals and explanation of benefits or other such reimbursement methodologies as determined by the IPA.
   a  Producing reports and collecting reimbursement for insured and reinsured services.
   b  Providing third party payor information for coordination of benefits and billing other payors for COB and other third party liability payments in accordance to the terms of the Plan agreement.
   c  Distributing payments to all ancillary and administrative providers.
   d  Preparing monthly, quarterly, and yearly financial statements and accounting protocols.

9.  Assistance in developing bonus distribution methodologies and distributing any such bonuses and or other risk sharing in accordance with bonus distribution methodologies.

10. Preparation of 1009s for all providers and vendors.

11. Establishment of internal control procedures designed to minimize opportunities for

12. misappropriation of IPA fund.

©1999: All Rights Reserved
MHCM MSA 7.99

4

(11)

51

C. <u>Risk Pool Administration. (If data is provided by Payors or Providers).</u>

1. Entering charges against risk pool(s) in computerized database.
2. Generating reports of charges against risk pool(s).
3. Verifying accuracy and validity of reports produced by Payors.
4. Reconciling risk pool(s) accounts with Payors and any internal arrangement between hospital and IPA.

D. <u>Management Information System.</u> Provide a management information system to include the handling of accounts receivable, accounts payable, patient tracking, claims processing, utilization analysis, and eligibility determination. MIS system to be available and accessible to IPA at all times (minimal downtime)

E. <u>Insurance and Risk Management.</u>

1. Providing recommendations regarding professional liability insurance, comprehensive liability insurance, workers' compensation insurance and disability insurance.
2. Coordinating IPA's risk management program.

F. <u>Patient Eligibility.</u>

   1. Obtaining eligibility lists from Payors.
   2. Assisting with determination of eligibility of patients for health care coverage prior to provision of medical services.
   3. Maintaining computerized eligibility database.
   4. Reconciling retroactive denial of eligibility against provision of medical services and authorization process by IPA against appropriate health care benefit agreement.
   5. Administering system for retroactive eligibility determination.
   6. Distributing eligibility reports to appropriate IPA providers, hospital staff and IPA.

G. <u>Provider Recruiting.</u> Assist in recruiting and negotiating contracts with new providers.

H. <u>IPA Provider Data.</u>

   1. Obtaining approved IPA provider applications from IPA.
   2. Negotiating agreements with IPA providers.
   3. Presenting complete provider applications and contracts for IPA approval.
   4. Maintaining data in computerized eligibility database.
   5. Tracking client provider contract renewal dates.
   6. Distribution of updated IPA provider lists, as appropriate.

©1999; All Rights Reserved
MHCM MSA 7.99

5

41

I.  Provider Relations.

    1.  Providing resources to train IPA providers and office staff in IPA's policies and procedures.
    2.  Distributing IPA's forms to IPA providers.
    3.  Assisting IPA in development and updating of a IPA manual.

J.  Education.

    1.  Educating physicians regarding IPA's polices and procedures.
    2.  Educating of Patients of IPA regarding third party payors.
    3.  Coordinating health education and wellness programs to Patients of IPA.

K.  Managed Care Contracting.

    1.  Implementation of managed care contracts and assistance in negotiation, if requested.
    2.  Negotiating agreements with hospital and ancillary providers within IPA service area.
    3.  Tracking contract renewal dates for agreements with third party payors.

L.  Liaison with Third Party Payors Contracting with IPA.

    1.  Coordinating communications with third party payors.
    2.  Providing third party payors with rosters of physicians in IPA, obtain provider health plan numbers, audit directories for accuracy.
    3.  Informing third party payors of roster changes.
    4.  Coordinating IPA network and office expansion to meet requirements of third party payors.
    5.  Assisting in resolving any grievances between IPA and third party payors.
    6.  Assisting in resolving patient grievances.

M.  Utilization Management, Quality Management and Medical Policy Committee Functions.

    1.  Administering managed care medical and hospital referral authorization procedure (include recommendations and policies and procedures for prior authorization of elective, urgent and emergent ambulatory and hospital services).
    2.  Designing, developing and implementing a physician education program and claims analysis program.

©1999; All Rights Reserved
MHCM MSA 7.99

6

47,

3. Providing administrative assistance prior to and at all managed care Utilization Management, Quality Management and Medical Policy Committee Meetings (e.g. meeting schedules, set-up, agenda, minutes) and provide administrative assistance to IPA's Medical Director.

4. Providing administrative support when applicable at each managed care Utilization Management Committee meeting pertinent to health benefits, billing information, referral authorization process, referral and practice patterns, compliance with referral authorization process, referral limitations, monitoring of coding procedures and utilization guidelines.

5. Providing administrative support for all managed care Quality Management activities as they relate to non-medical policy and procedure development, data collection, meeting administration, documentation of finds, monitoring of IPA developed requirements for medical record documentation and responses to member grievances.

6. Providing administrative support for the managed care Medical Policy Committee as it relates to non-medical policy and procedure development, meeting administration, documentation of finds, and consistent application of non-medical adopted polices.

7. Developing a Provider Profiling system which includes a database of information relating to provider practice patterns, referral behavior and utilization of hospital, specialty and ancillary resources.

REMAINDER OF THIS PAGE INTENTIONALLY LEFT BLANK

©1999; All Rights Reserved
MHCM MSA 7 99

43

# EXHIBIT C

# PERFORMANCE

IPA and MHCM agree that certain specific performance standards, measurement criteria, measurement period, penalties and bonuses as detailed in this Exhibit are required. IPA and MHCM shall measure results quarterly and jointly evaluate them. MHCM will provide IPA with monthly contract compliance reports within fifteen (15) days of the completion of each month.

## Performance Guidelines

**A.    *Claims Compliance***

All claims counted for purposes of evaluating performance shall exclude those claims where IPA has not provided eligibility, contract information, or authorization information to permit adjudication of the claim.

1.    Regulatory Compliance for Claims

The following standards will be adhered to:

*Medicare Claims*
- 95% of clean claims from noncontracted providers will be processed within 30 calendar days or within standards required by health plans.
- 95% of unclean and contracted claims will be processed within 60 calendar days or within standards required by health plans.

*Commercial/Medi-Cal claims*
- 95% of clean claims will be processed within 60 calendar days or within standards required by health plans.

©1999: All Rights Reserved
MHCM MSA 7.99

R

44

2.    <u>Payment Accuracy</u>

The following standards will be adhered to:

- 98% of all claims in sample paid correctly in accordance with contract terms and conditions.

3.    <u>Encounter Reporting</u>

95% of encounters will be reported to the HMOs within the required time period.
MHCM will identify to IPA those PCPs and capitated specialists who are not compliant with encounter reporting and jointly develop a plan to improve encounter reporting

**B.    *Authorizations***

1.    <u>Authorization Turn Around</u>

Processing of authorizations will meet the following standards:
Note:  time measurement begins when the authorization is received in MHCM office and ends when the authorization is approved and provided to the requesting physician.

| | |
|---|---|
| Emergent authorizations: | **Immediate** |
| Urgent authorizations | **2 hours** |
| Non-urgent authorizations | **2 business days** |

2.    <u>On-line Authorizations using MHCM Web based system.</u>

Standard:    All PCPs will have access to the MHCM system within ninety (90) days of the effective date of this Agreement.

Standard:    MHCM will maintain a fax-based back-up system for authorizations processing

©1999; All Rights Reserved
MHCM MSA 7.99

9

43

**C.**    ***Implementation and administration of Specialty and Ancillary Provider Reimbursement Methodologies***

1.    Specialty zero based budgeting methodology and/or contact cap reimbursement

Standard:    MHCM will work with IPA to administer and monitor specialty zero based budgeting reimbursement system.

Standard:    MHCM will work with IPA to administer and monitor a contact cap reimbursement methodology for identified specialties.

Standard:    MHCM will work with IPA to identify the most appropriate reimbursement methodology for various specialties.


**D.**    ***Successful Implementation Definition.***

In accordance with the set-up fee payment schedule identified in Exhibit A, MHCM and IPA agree that "Successful Implementation" will be defined as follows:

> 90% of items identified in the attached "Implementation Checklist" (attached) completed by Day 1 (Day 1 defined as the first day that the first Plan Agreement becomes effective).


NOTE:  Attach MHCM Implementation Checklist

©1999; All Rights Reserved
MHCM MSA 7.99

1

44

Amendment 001
to
Management Services Agreement

This Amendment is entered into by and between Meridian Health Care Management, Inc. (MHCM) and Northridge Medical Group, Inc. (Client) as of the FIRST (1ˢᵗ) day of September, 1999 amending the Management Agreement effective August 1, 1999.

The parties hereby agree that:

1.  Exhibit "A", Section B. is deleted in its entirety and replaced as follows:

    B.  In addition to any fees paid to MHCM under Section A of this Exhibit, commencing September 1, 1999, IPA shall remit to MHCM, within thirty (30) days of IPA's receipt of MHCM's invoice for services, a monthly payment equal to **11.6%** of Gross Revenue, as defined in Article IV.1 (a) of this Management Services Agreement.

2.  Exhibit "B" is revised to include Section N. as follows:

    N.  Coordination of Credentialing Activities.
    1.  Preparing provider credentialing packets for distribution
    2.  Coordinating with CheckPoint, as appropriate
        a.  Sending completed provider credentialing packets to CheckPoint for PSV.
        b.  Receiving completed CheckPoint verification information and place in provider files.
    3.  Sending complete provider applications to Payors requiring copies.
    4.  Coordinating Payor required provider site visit reports conducted by Marlborough Medical Management.
    5.  Coordinating information received with Client's Medical Director; reviewing provider files with Client's Medical Director.
    6.  Maintaining credentialing data in MHCM database and appropriate provider files.
    7.  Staffing Client credentialing committee meetings as frequently as necessary to conduct business.
        a.  Taking and maintaining minutes.
    8.  Maintaining and updating Credentialing Policies and Procedures to ensure compliance with NCQA and Payor requirements.
    9.  Coordinating recredentialing activities with Checkpoint and Marlborough Medical Management.
        a.  Sending out notices and collect information required for recredentialing.
    10. Coordinating Payor audit site visits for those Payors that delegate credentialing activities to Client.
    11. Coordinating Payor quality assurance activities that relate to credentialing issues.

45

12. Reporting administrative issues to state agencies, as appropriate and directed by Client.

3.  All other provisions not inconsistent shall remain in full force and effect.

By:                                                By:

Meridian Health Care Management, Inc.              Northridge Medical Group, Inc.

_Gertrude S. Carter, M.D._

_DBRoss_                                           _____
_____                   Signature
Dolores B. Ross

Executive Vice President                           _President_
_____                   _____
Title                                              Title

Date: ___2/15/00___                                Date: ___2/17/00___

46

**Amendment 002**
**to**
**Management Services Agreement**

This Amendment is entered into by and between Meridian Health Care Management, Inc. (MHCM) and Northridge Medical Group, Inc. (Client) as of the twenty-eighth (28th) day of September, 2000 amending the Management Agreement effective August 1, 2000.

The parties hereby agree that:

1. Article II.5 is deleted in its entirety and replaced as follows:

    II.5  **Utilization and Quality Management.** MHCM shall provide such utilization and quality management services as are reasonable necessary for the operations of the Business. These services shall include eligibility verification, concurrent review for out of network and out of area admissions, case management, specialty referral review, claims review, and hospital and utilization tracking and information management and coordination with hospital utilization management and case management staff in accordance with Exhibit "B". All services shall be performed in accordance with written utilization and quality management policies and procedures developed in consultation with MHCM.

2. Exhibit "A", Section B. is deleted in its entirety and replaced as follows:

    B. In addition to any fees paid to MHCM under Section A of this Exhibit, commencing August 1, 2000, IPA shall remit to MHCM, within thirty (30) days of Client's receipt of MHCM's invoice for services, a monthly payment equal to eleven and ninety-five hundredths percent (11.95%) of Gross Revenue, as defined in Article IV.1 (a) of this Management Services Agreement.

3. Exhibit "A" is revised to include Section F. as follows:

    F. For any medical management service Client or designee (including but limited to Northridge Hospital Medical Center (NHMC) or consultants) has requested or approved outside the scope of this Agreement as set forth in Exhibit "B", Client agrees to compensate MHCM at a rate of $34.00 per hour per FTE required to perform needed services within thirty days of Client's receipt of MHCM's invoice for services.

4. Exhibit "B", Sections O., P. and Q. are created as follows:

    O. <u>Concurrent Review/Discharge Planning Services.</u>

47

1. In-patient Concurrent Review
   a. Out of Area – Notifying health plans and hospitalist of out of area (as defined in Client's health plan contracts) admissions, coordinating initial reviews and continued reviews, as appropriate per health plan contract. Such reviews include applicable systems documentation and patient/provider notifications.
   b. Admissions outside of NHMC Roscoe and Sherman Way campuses and affiliated skilled nursing facilities – Coordination with Client's contracted hospitalist vendor for transfer of patients back into the NHMC system. MHCM shall provide concurrent review services for those patients admitted to hospitals (acute and skilled nursing facilities) outside the NHMC system until such patients are stable for transfer back into the NHMC system. Such services include applicable systems documentation and patient/provider notifications. NHMC shall be responsible for concurrent review/discharge planning services, inclusive of applicable systems documentation and patient/provider notifications, for admissions to NHMC acute facilities and for concurrent review/discharge planning services for admissions to NHMC skilled nursing facilities.—MHCM shall be responsible for the applicable systems documentation (as provided by NHMC) and patient notifications to NHMC for delivery to patient/representative for skilled nursing concurrent review/discharge planning services.

P. **Case Management Services**
1. Catastrophic Case Management
   a. Management of complex, catastrophic care as referred to MHCM from NHMC, Client or designee (including but not limited to NHMC, hospitalist or consultants) inclusive of applicable systems documentation and patient/provider/health plan notifications.

2. Community Case Management
   a. Management of chronic patients through continuums of care outside the facility setting (e.g. home health, DME services) inclusive of applicable systems documentation and patient/provider/health plan notifications. Community case management does not include any Disease State Management services.

Q. All other medical management services provided by MHCM shall be subject to the compensation as set forth in Exhibit "A", Section F.

5. MHCM and Client agree that should Client wish to modify the responsibilities of either party relative to this Amendment 002, Client shall provide MHCM with ninety (90) days notice. During that ninety (90) day period Client and MHCM agree to meet and negotiate a modification which is mutually agreeable.

6. All other provisions not inconsistent shall remain in full force and effect.

By:                                          By:

Meridian Health Care Management, Inc.       Northridge Medical Group, Inc.

_____            _Gertrude Carter, MD_
Dolores B. Ross                             Signature

Executive Vice President                    President
Title                                        Title

Date: _____               Date: _10/30/2000_

49

**Meridian**
Health Care Management, Inc.

Amendment 003
to
Management Services Agreement

This Amendment is entered into by and between Meridian Health Care Management, Inc. ("MHCM") and Northridge Medical Group, Inc. ("IPA") as of this 1st day of Aug. 2002 amending the Management Services Agreement ("MSA") entered into by the parties effective July 1, 1999, and its Amendment 001 entered into effective September 1, 1999 and its Amendment 002 entered into effective August 1, 2000

The parties hereby agree that:

1. This Amendment shall be effective as of the first day of August, 2002.

2. The term of the MSA shall be extended for two (2) years effective August 1, 2002.

3. Exhibit "A" Section B. of the MSA is deleted in its entirety and is replaced with the following:

Effective on August 1, 2002, IPA shall remit to MHCM, within thirty (30) days of IPA's receipt of MHCM's invoice for services, a monthly payment equal to:

i. Ten and one-half percent (10.50%) of Gross Revenue, as defined in Article IV.1(a) of the Management Services Agreement, not to exceed $4.35 Per Member Per Month ("PMPM") for commercial and POS members and $26.75 PMPM for senior members less

ii. Ten Thousand Dollars ($10,000.00) to reflect the reduction in staff and services provided by MHCM related to this Amendment, plus

iii. One hundred twenty-five percent (125.00%) of the direct cost of salaries/wages for MHCM employees specifically dedicated to IPA support and under the direct supervision of IPA Executive or Medical Director ("IPA Support Staff") as described in Exhibit B.H.14-16 attached hereto, plus

iv. Three hundred forty dollars ($340.00) per month per IPA Support Staff and IPA Executive and Medical Director to offset MHCM direct costs for office space, furniture, telephone, computer equipment, printer access, fax access and mail support ") as described in Exhibit B.H.14-16 attached hereto.

v. For primary source provider credentialing, if provided by MHCM, a fee of one hundred twenty-five dollars ($125.00) per initial credentialing and seventy-five dollars ($75.00) per re-credentialing.

NMG Amendment 003 020801.doc

50



4. Exhibit "A" Section C. of the MSA is deleted in its entirety and is replaced with the following:

> Notwithstanding Section B of this Exhibit, the monthly fee paid to MHCM for providing management services as described in Exhibit "B" hereof shall be a minimum of fifty thousand dollars ($50,000.00) per month, effective July 1, 2002.

5. Exhibit "B" of the MSA is deleted in its entirety and replaced with Exhibit "B" attached hereto.

6. Exhibit "C" of the MSA is deleted in its entirety and replaced with Exhibit "C" attached hereto.

7. Amendment 001 to the MSA is deleted in its entirety.

8. Amendment 002 to the MSA is deleted in its entirety.

9. All terms and conditions of the MSA and Amendments 001 and 002 not inconsistent herewith shall remain in full force and effect.

IN WITNESS WHEREOF, the parties have hereunto set their hand as of the day and year first above written.

Meridian Health Care Management, Inc. ("MHCM")

Michael J. Alper, President & CEO

Date   8/1/02

Northridge Medical Group, Inc. ("IPA")

Gertrude Carter, MD, President

Date   11-20-02

Sikander Kajani, M.D.
Vice President

Date   7/29/02

NMG Amendment 003 020801.doc

Page 2 of 2

51

## EXHIBIT "B"
## SERVICE MATRIX

| | | IPA | MHCM |
|---|---|---|---|
| **A.** | **MANAGEMENT INFORMATION SYSTEM** | | |
| | 1.  Provide a computerized management information system to process and store the following: | | |
| | a.  Member eligibility files | | X |
| | b.  Provider demographic files | | X |
| | c.  Provider vendor files | | X |
| | d.  Provider fee schedules | | X |
| | e.  Benefit packages | | X |
| | f.  Referral/authorization requests | | X |
| | g.  Claims record | | X |
| | h.  Capitation payments | | X |
| | i.  Accounts receivable | | X |
| | j.  Accounts payable | | X |
| | 2.  Provide appropriate PRIMEridian™ data security | | X |
| | a.  Restrict access to data to all non-MHCM personnel | | X |
| | b.  Restrict access to data to specific Client-specified individuals | | X |
| | c.  Restrict access to data by user and security classification | | X |
| | 3.  Provide PRIMEridian™ emulation software for use by Client at Client location(s) | | X |
| | 4.  Provide technical support | | X |
| | a.  Connectivity to MHCM systems at Client location(s) | | X |
| | b.  Availability of PRIMEridian DIRECT™ | | X |
| | 5.  Provide client training on MHCM systems | | X |
| | a.  At Client site | | X |
| | b.  At Client Provider sites | | X |
| | c.  At MHCM training facility | | X |
| | | | X |
| **B.** | **CLAIMS MANAGEMENT** | | X |
| | 1.  PROCESSING | | |
| | a.  Receive electronic UB92 claim data from Client and/or Client providers via a claims clearinghouse | | X |
| | b.  Receive electronic HCFA 1500 format claims data from Client and/or Client providers via PRIMEridian DIRECT™ or via a claims clearinghouse | | X |
| | c.  Receive via mail completed HCFA 1500 and UB92 claim forms from Client providers | | |
| | d.  Digitally image claims and upload nightly to PRIMEridian™ | | X |
| | e.  Enter claims data into PRIMEridian™ | | X |
| | 2.  ADJUDICATION | | X |
| | a.  Adjudicate claims in accordance with Client's instructions, policies, provider and payor contracts. | | X |
| | b.  Match completed claim to authorization record when required by Client policies | | |
| | c.  Prohibit adjudication of claims without authorization in accordance with Client policies | | X |
| | d.  Allow re-adjudication of previously unauthorized claims when authorization is properly acquired | | X |
| | e.  Validate claim coding for appropriate diagnosis(es), procedure(s), etc. | | X |
| | f.  Adjudicate co-payment, co-insurance and/or deductible for each claim | | X |
| | g.  Adjudicate benefit limits and coverage | | X |
| | h.  Calculate allowed payment according to Client specified fee schedule(s) | | X |
| | i.  Support multiple fee schedules for Client providers (within acceptable parameters) | | X |
| | j.  Support periodic adjustments to fee schedules | | X |
| | k.  Track other primary health insurance coverage for COB include an item to treat commercial members over 65 as Medicare prime. | | X |
| | l.  Adjudicate COB to be paid by other primary Payor(s) | | |
| | m.  Adjudicate TPL to be paid by other primary Payor(s) | | X |
| | n.  Track payments made by primary Payor | | X |
| | 3.  PAYMENT | | X |
| | a.  Release payable claims to Providers in compliance with Payor, state, HCFA mandated timeframes and other requirements (as cash allows) | | X |
| | b.  Work with client to resolve issues preventing compliance with Payor, state, and HCFA-mandated timeframes or other requirements for paying claims | | X |
| | c.  Aggregate multiple claims by individual vendor (potentially multiple providers) within a check | | X |

Page 1 of 6

| | | IPA | MHCM |
|---|---|---|---|
| | run into single payment and explanation of payment | | |
| d. | Generate claim denial letters | | |
| **4.** | **REPORTING** | | X |
| a. | Generate claims history reports as required by Payors or HCFA | | |
| b. | Generate standard claims history reports by date of service and date paid. | | X |
| c. | Generate standard data warehouse files when requested by Client | | X |
| d. | Generate EDI submission of HCFA 1500 and UB92 encounter data to Payors | | X |
| e. | Generate EDI submission of insured services to Payors | | X |
| f. | Generate IBNR calculation | | X |
| g. | Generate detailed encounter reports | | X |
| h. | Generate referral, utilization, and cost reports based on claim data per Client request | | X |
| i. | Track claims cost by service by member by provider by medical group by specialty, by place of service | | X |
| j. | Generate report on stop loss submissions and recoveries by claim by member | | |
| k. | Generate quarterly/annual report(s) on aggregate stop loss receivables and recoveries | | X |
| l. | Generate TPL reporting | | X |
| m. | Generate COB reporting | | X |
| | | | X |
| **C.** | **MEDICAL MANAGEMENT** | | |
| **1.** | **REFERRAL DATA ENTRY AND PROCESSING** | | |
| a. | Provide capability for Client or Client providers to enter referral requests into PRIMEridian DIRECT™ or PRIMEridian™. | | X |
| b. | Receive routine prospective and retrospective referral requests via fax and PRIMEridian DIRECT™ from Client providers | | X |
| c. | Receive urgent or emergent referral requests via telephone from Client providers | | |
| d. | Enter referral requests into PRIMEridian™ | | X |
| e. | Assign computer generated tracking number to each referral request | | X |
| f. | Perform eligibility verification of member | | X |
| g. | Issue approval by non-clinical staff to referral requests in strict accordance with Client's instructions and policies | | X |
| h. | Issue approval by clinical staff to referral requests in strict accordance with Client's instructions and policies | | X |
| i. | Send via fax and/or PRIMEridian DIRECT™ computer generated notice of approval to providers involved in the referral request in strict accordance with Client's Payor contracts, instructions and policies | | X |
| j. | Send via U.S. mail computer generated notice of approval to member | | |
| k. | Send to requesting provider notice describing Client's need for additional data prior to authorization of referral request in strict accordance with Client's instructions and policies | | X |
| l. | Send to providers involved in the referral request notice of denial via fax in strict accordance with Client's instructions and policies | | X |
| m. | Send via U.S. mail to member notice of denial in strict accordance with Client's Payor contracts instructions and policies | | X |
| n. | Prepare agenda and minutes for Utilization Management Committee (UMC) meetings with assistance from MHCM as necessary | X | |
| o. | Provide pertinent reports for UMC meetings | | |
| p. | Attend UMC meetings with assistance from MHCM as necessary | X | X |
| q. | Facilitate UMC meetings with assistance from MHCM as necessary | X | |
| **2.** | **UTILIZATION REVIEW** | | |
| a. | Prospective and Retrospective Review | | |
| i. | Generate daily log of referral requests requiring action by Client | | |
| ii. | Send to Client via fax or PRIMEridian DIRECT™ daily log of referral requests requiring action by Client | | X |
| iii. | Client will review daily log of referral requests and denote action to be taken for each referral request contained in log. Such direction from Client shall include the following: authorize, deny, or request for additional data. | X | |
| iv. | Enter action into PRIMEridian™ and issue authorization, denial, or request for additional data for each referral request contained in daily log in strict accordance with Client's instructions and policies | | X |
| v. | Enter into PRIMEridian™ the requested new data to each referral request as applicable. | | X |
| vi. | Allow a single tracking number for multiple services by place of service or provider requested | | X |

Confidential and Proprietary Meridian Health Care Management, Inc.
NMG Amendment 003 Exhibit B 020801.doc

S 3

| | | IPA | MHCM |
|---|---|---|---|
| vii. | Track pre-certified admissions by provider and by facility | | |
| viii. | Check authorizations for conformity with Client's adopted critical pathways or clinical protocols | | X |
| ix. | Check appropriateness of location and delivery modality of requested services | | X |
| b. | Concurrent Review and Case Management (in area, out of area, skilled nursing, and durable medical equipment, which does not meet automatic approval criteria) | | X |
| i. | Identify inpatient admissions for which Client and/or Payor(s) require concurrent review | X | |
| ii. | Create a tracking number via PRIMEridian™ for each admission | X | |
| iii. | Document appropriate concurrent review and discharge planning data for each admission in PRIMEridian™ | X | |
| iv. | Provide on-site UR Nurse to perform daily chart reviews | | |
| v. | Provide UR nurse to perform daily chart reviews telephonically | X | |
| vi. | Perform concurrent length-of-stay reviews | X | |
| vii. | Perform case management and discharge planning, including durable medical equipment referrals which does not meet automatic approval criteria. | X | |
| viii. | Provide patient data for hospital admissions | | |
| c. | Reporting | X | |
| i. | Track consolidated or by provider referral request turn around time per NCQA standards | | X |
| ii. | Track bed day activity by length of stay, facility, Payor, commercial/senior status, admit/discharge diagnosis and level of care per NCQA standards | | X |
| iii. | Report on aberrant inpatient as identified by Case Manager | | X |
| iv. | Compile demographic information on patients treated by Client | | X |
| v. | Track referrals by member, provider, group, specialty, place of service, referral submission date, admit/discharge date, Payor and/or diagnosis | | X |
| vi. | Track location of services by member by provider by medical group by specialty by place of service | | X |
| **3.** | **QUALITY MANAGEMENT** | | |
| a. | Assist with development of Client's Quality Management Program | | |
| b. | Prepare agenda and minutes for Quality Management Committee (QMC) meetings | | X |
| c. | Provide pertinent reports for QMC meetings | | X |
| d. | Attend QMC meetings | | X |
| e. | Facilitate QMC meetings | | X |
| f. | Track member grievance and appeals issues | X | |
| g. | Resolve member grievance and appeals issues as delegated by Client in strict accordance with client's instructions and policies. | | X |
| h. | Provide for HEDIS tracking and reporting | | X |
| i. | Integrate HEDIS and other outcomes data | | X |
| j. | Report performance statistics to Client Medical Director or UM/QM Committee | | X |
| k. | Communicate Client's performance standards to providers | | X |
| l. | Administer member satisfaction surveys per NCQA guidelines | | X |
| m. | Report results of member satisfaction surveys | | X |
| n. | Administer provider satisfaction surveys per NCQA guidelines | | X |
| o. | Report results of provider satisfaction surveys | | X |
| **4.** | **POLICIES AND PROCEDURES** | | X |
| a. | Provide limited consulting services as requested of MHCM Medical Director to assist Client with: | | X |
| i. | Grievances with Payors relating to medical matters | | |
| ii. | Grievances with members relating to medical matters | | X |
| iii. | Client's physician and hospital referral authorization policies and procedures | | X |
| iv. | Agenda and discussion at UMC and QMC meetings | | X |
| v. | Development or updates of clinical protocols, critical pathways and other treatment standards and guidelines | | X |
| vi. | Other medical matters as requested by Client | | X |
| b. | Assist with development or updates of medical management policies | | X |
| c. | Assist with development or updates of prospective review guidelines (including hospital pre-certification) | X | X |
| d. | Assist with development or updates of concurrent review standards and guidelines | X | X |
| e. | Assist with development or updates of case management program | X | X |
| | | X | X |

| D. | PROVIDER PANEL MANAGEMENT | IPA | MHCM |
|---|---|---|---|
| | 1.  PROVIDER CONTRACTING | | |
| | a.  Identify Client need(s) for new or additional provider(s) | | |
| | b.  Assist Client with recruitment of new or additional providers | | X |
| | c.  Review and recommend changes/updates to Client provider applications, contracts and memorandums of understanding | | X |
| | d.  Obtain completed provider applications from new providers | | X |
| | e.  Present to Client Board of Directors completed provider applications | | X |
| | f.  Negotiate provider contracts or memorandums of understanding with new providers at direction of Client | | X |
| | g.  Amend current provider contracts or memorandums of understanding at direction of Client | | X |
| | h.  Maintain files containing current and historical provider contracts and memorandums of understanding | | X |
| | i.  Track renewal dates of provider contracts and memorandums of understanding | | X |
| | j.  Negotiate member-specific letters of agreement with non-contracted providers at agreed upon criteria | | X |
| | 2.  PROVIDER RELATIONS | | |
| | a.  Maintain database of providers and provider demographics | | |
| | b.  Maintain network participation and/or affiliation | | X |
| | c.  Maintain vendor database | | X |
| | d.  Maintain Board of Director and shareholder status | | X |
| | e.  Maintain providers ability to speak additional languages | | X |
| | f.  Audit database of providers and provider demographics | | X |
| | g.  Maintain database of open/closed status of providers | | X |
| | h.  Generate provider roster as necessary | | X |
| | i.  Distribute updated provider roster to Client on monthly or other periodic basis | | X |
| | j.  Assist with development and updates of Provider Manuals | | X |
| | k.  Produce an distribute Provider Manuals | | X |
| | l.  Provide ongoing communication, education, and training to provider and provider office staffs regarding changes to Client policies and procedures | | X |
| | m.  Provide ongoing communication, education, and training to provider and provider office staffs regarding changes to Payor contracts | | X |
| | n.  Assist with development and updates of provider grievance process | | |
| | o.  Administer provider grievance process | | X |
| | p.  Provide telephone line for provider inquiries | | X |
| | q.  Answer provider eligibility inquiries | | X |
| | r.  Answer provider referral inquiries | | X |
| | s.  Answer provider claims inquiries | | X |
| | t.  Track key performance standards (e.g. extended office hours, encounters per member, referrals per member, etc.) | | X |
| | u.  Develop administrative forms (e.g. referral request) | | |
| | v.  Print administrative forms (e.g. referral request) | | X |
| | w.  Distribute administrative forms (e.g. referral request) | | X |
| | x.  Develop provider newsletter | | X |
| | y.  Print provider newsletter | | X |
| | z.  Distribute provider newsletter | | X |
| | 3.  PROVIDER CREDENTIALING | | |
| | a.  Maintain compliance with NCQA standards | | |
| | b.  Process applications for new providers | | X |
| | c.  Perform primary source verification | | X |
| | d.  Perform site visits | X | |
| | e.  Maintain provider application and credential files | X | |
| | f.  Maintain computerized database of provider credentialing information | | X |
| | g.  Track key identifiers (e.g. license #, DEA #, Medicare #, Tax ID, etc.) | | X |
| | h.  Track key statistics (e.g. hospital staff status, board certification status, malpractice insurance data) | | X |
| | i.  Perform re-credentialing of current providers | X | |
| E. | MEMBERSHIP MANAGEMENT | | |
| | 1.  ELIGIBILITY VERIFICATION | | |
| | a.  Obtain benefits and eligibility files from Client or Payor, reconcile against existing eligibility data, and load into MHCM system electronically or manually | | X |

Confidential and Proprietary Meridian Health Care Management, Inc.
NMG Amendment 003 Exhibit B 020801.doc

| | | IPA | MHCM |
|---|---|---|---|
| b. | Maintain member eligibility database | | |
| c. | Identify each member by unique identification number | | X |
| d. | Assist with determination of member eligibility for health care services prior to provision of services | | X |
| e. | Maintain benefit database to track co-payments, co-insurance, deductibles, other primary health insurance, coverage limitations, lifetime maximum benefits and other benefits by member if supplied by Client or Payor | | X |
| f. | Maintain and track eligibility of services for each member | | |
| g. | Allow on-line retrieval through PRIMEridian DIRECT™ by provider offices of updated eligibility information | | X |
| h. | Generate monthly eligibility reports and distribute monthly to Client and Client providers | | X |
| i. | Match benefit coverage to authorization and claim at all points of service | | X |
| j. | Maintain eligibility history of each member for retroactive verification | | X |
| k. | Administer system for retroactive eligibility verification | | X |
| l. | Reconcile retroactive denial of eligibility against Client claims payment process | | X |
| **2.** | **MEMBER SERVICES** | | X |
| a. | Provide telephone line for member inquiries | | |
| b. | Answer member eligibility inquiries | | X |
| c. | Answer member referral inquiries | | X |
| d. | Answer member claims inquiries | | X |
| e. | Generate telephone tracking report | | X |
| f. | Utilize standard letter to inform members of grievance process | | X |
| g. | Issue correspondence acknowledgement letters | | X |
| h. | Issue new member welcome letter | | X |
| | | | X |
| **F.** | **PAYOR CONTRACTING** | | |
| 1. | Identify opportunities for risk contracts with Payors, including pre-paid health plans (HMOs), preferred provider organizations, exclusive provider organizations, self-insured employers, employee unions, and indemnity carriers. | X | |
| 2. | Negotiate risk contracts with Payors | | |
| 3. | Negotiate risk sharing agreements with Payors, hospitals and other applicable entities | X | |
| 4. | Coordinate Client communication with Payors | X | |
| 5. | Inform Payors of changes to Client provider roster | | X |
| 6. | Provide Payors with current Client provider roster | | X |
| 7. | Coordinate expansion of Client provider network to accommodate Payor needs | | X |
| 8. | Assist in resolution of grievances between Client and Payor(s) | | X |
| 9. | Track renewal dates of Payor contracts | | X |
| | | X | |
| **G.** | **FINANCIAL MANAGEMENT** | | |
| **1.** | **CAPITATION MANAGEMENT** | | |
| a. | Accept and deposit all capitation payments to Client | | |
| b. | Reconcile capitation payments with available eligibility lists and other pertinent documents | | X |
| c. | Produce and distribute capitation payments to capitated primary care physicians | | X |
| d. | Produce and distribute capitation payments to capitated specialty physicians, hospitals, and ancillary providers based upon capitation distribution methodology approved by Client | | X |
| e. | Provide information to third party Payors for coordination of benefits | | |
| f. | Bill & collect additional reimbursement for insured and reinsured services | | X |
| g. | Distribute payments to all fee-for-service providers (in accordance with Article B of this Exhibit) | | X |
| h. | Assist Client with development of bonus distribution methodologies | | X |
| **2.** | **RISK POOL ADMINISTRATION** | | X |
| a. | Track charges against risk pool(s) | | |
| b. | Generate report of charges against risk pool(s) | | X |
| c. | Verify accuracy and validity of risk pool reports generated by Payors or hospital(s) | | X |
| d. | Reconcile risk pool surplus(es) or deficit(s) with Payors and hospital(s) | | X |
| e. | Pursue timely recovery of all risk pool surpluses | | X |
| f. | Negotiate favorable payments terms for Client share of validated deficits | | X |
| **3.** | **BOOKKEEPING AND ACCOUNTING** | | X |
| a. | Establish and maintain bookkeeping system for all Client business handled by MHCM | | |
| b. | Establish and maintain accounting system for all Client business handled by MHCM | | X |
| c. | Establish and maintain an accounts payable system | | X |
| d. | Maintain custody and supervision of business records for all Client business handled by MHCM | | X |
| e. | Prepare bills and statements for professional services rendered by Client under contracts | | X |

|  |  |  | IPA | MHCM |
|---|---|---|---|---|
|  |  | managed by MHCM |  |  |
|  | f. | Assist with compilation of reports and forms required by government agencies and Payors |  |  |
|  | g. | Establish and manage Client bank accounts |  | X |
| 4. | FINANCIAL ANALYSIS |  |  | X |
|  | a. | On an as needed bases provide flexible pro forma financial modeling, including major operating objectives, anticipated revenues, expenses, and cash flow with assistance of Client. |  | X |
|  | b. | Assist Client with determining need for credit lines and/or short-term investments |  |  |
|  | c. | Assist Client with establishing needed credit lines |  | X |
|  | d. | Assist Client with placing short-term investments |  | X |
|  | e. | Manage short-term investments at the direction of the Client |  | X |
|  | f. | Monitor cash flow and balance sheet for adequate risk reserves |  | X |
| 5. | REPORTING |  |  | X |
|  | a. | Generate monthly and YTD balance sheet, income statement, and cash flow statement |  |  |
|  | b. | Generate financial statements on both a cash and an accrual basis |  | X |
|  | c. | Generate monthly and YTD accounts receivable aging report |  | X |
|  | d. | Generate monthly and YTD accounts payable aging report |  | X |
|  | e. | Generate periodic claims lag study (however, not prior to six months of fully paid claims data) |  | X |
|  | f. | Generate monthly report regarding claims status (i.e. open, payable, IBNR) |  | X |
|  | g. | Provide pertinent reports for finance committee meetings |  | X |
|  | h. | Attend finance committee meetings |  | X |
|  | i. | Facilitate finance committee meetings |  | X |
|  | j. | Assist with preparation of audited or unaudited financial statements as prepared by third party when requested by Client |  | X |
|  | k. | Generate data and supporting documents required for tax preparation |  |  |
|  | l. | Generate Form 1099 for each provider paid by Client during the calendar year |  | X |
|  | m. | Mail Form 1099 to each provider paid by Client during the calendar year |  | X |
| **H.** | **GENERAL ADMINISTRATION** |  |  |  |
|  | 1. | Supervise and coordinate business aspects of Client's risk contracts |  |  |
|  | 2. | Serve as primary point of contact on behalf of Client |  | X |
|  | 3. | Report directly to Client Board of Directors |  | X |
|  | 4. | Provide 24 hour per day, 7 days per week toll-free automated telephone access to MHCM |  | X |
|  | 5. | Provide on-line assistance |  | X |
|  | 6. | Provide ongoing systems support and training |  | X |
|  | 7. | Provide access to Client data an average of 20 hour per day, 7 days per week |  | X |
|  | 8. | Provide recommendations for insurance, including reinsurance, D&O, E&O, professional liability, general liability, workers compensation, and disability |  | X |
|  | 9. | Coordinate printing of all forms and letterhead (to be used regarding managed care) on Client stationery (actual cost is passed through to Client) |  | X |
|  | 10. | Process managed care related mail, both incoming and outgoing |  |  |
|  | 11. | Generate ad hoc reports as requested by Client |  | X |
|  | 12. | Coordinate regulatory and payor audits (e.g. NCQA, HCFA) at MHCM and at provider sites and provide NMG with copies of audits and corrective action plans. |  | X |
|  | 13. | Provide adequate office space and furnishings for MHCM staff |  |  |
|  | 14. | Recruit and hire and employ with MHCM standard benefits up to 5 employees to be directly supervised by IPA to perform concurrent review/case management/DME/Home Health management services. If IPA should require additional employees, IPA will provide MHCM with sixty (60) days notice. |  | X |
|  | 15. | Provide and furnish work space for 5 employees plus IPA Executive and Medical Director in accordance with MHCM standards. If IPA should require additional space, IPA will provide MHCM with sixty (60) days notice. |  | X |
|  | 16. | Provide telephone and telephone service, computer and network access, printer access, fax access, e-mail accounts for 5 employees and IPA Executive and Medical Director (required to provide their own PC acceptable to MHCM). If IPA to require access for additional employees, IPA will provide MHCM with sixty (60) days notice. |  | X |

Confidential and Proprietary Meridian Health Care Management, Inc.
NMG Amendment 003 Exhibit B 020801.doc

## Exhibit C

## Performance Standards

MHCM agrees to meet the Performance Standards identified below.

| Component | Standard | Performance Measurement | Frequency |
|---|---|---|---|
| Reports | Provide CEO with the following reports on a regular basis | • Physician report Card to be provided quarterly<br>• Specialty Expenses Analysis to be provided monthly<br>• PMPM cost analysis by health plan to be provided monthly<br>• Monthly Claims Data Extract Report to be provided within 5 business days of close of preceding month<br>• Bed Day report to be provided monthly<br>• Bed day log report to be provided daily | Quarterly or monthly as indicated |
| Claims and Encounters | Processing Accuracy | • 98% payment dollar accuracy<br>• 96.5% payment incidence accuracy<br>• 98% administrative accuracy | Annually |
|  | Turn around | • 95% of non-contracted clean claims paid/denied within 30 days.<br>• 95% of clean contracted claims paid within 60 calendar days. |  |
|  | Encounters | • Encounters from capitated providers and PCPs to be input within 15 days of receipt. | Monthly |

Confidential and Proprietary Meridian Health Care Management, Inc.
NMG Amendment 003 020801 Exhibit C and D.doc

58

| Component | Standard | Performance Measurement | Frequency |
|---|---|---|---|
| | Reporting | • MHCM to provide weekly reporting of claims inventory<br>• MHCM to provide monthly reporting of audit results and claims audit results<br>• MHCM to provide reporting of compliance with performance standards | Weekly or monthly as indicated |
| | Post Payment Review | MHCM to provide CEO with all post payment check runs so that CEO can perform a review | Weekly |
| Utilization Review | Meet the following standards for 95% of authorizations | Emergency: Immediate<br>Urgent: 4 hours<br>Non-urgent: 2 business days | |
| Finance | Reconciliation | Bank reconciliation completed 1 month in arrears with no unresolved amounts | |
| Administration | Contracts | Send contracts out to providers within five days of request and track process. | NA |
| | | Load contracts into MHCM system within 5 days of receipt | NA |
| | | Corrections of contract entry errors to be made within 24 hours of notification | |
| | Eligibility | Updated within 3 business days of receipt | |

Confidential and Proprietary Meridian Health Care Management, Inc.
NMG Amendment 003 020801 Exhibit C and D.doc

S9

## Exhibit D

### Corrective Action Plan

1. Any deficiencies in MHCM's performance pursuant to Exhibit B or C shall be identified by IPA and provided to MHCM in writing.
2. MHCM shall review such deficiencies and within 15 calendar days, submit to IPA a corrective action plan ("CAP") which will identify how each deficiency will be corrected and by which date.
3. IPA shall review the CAP and shall have the right to require MHCM to revise the steps MHCM will take to correct the deficiencies or the dates by which the deficiencies will be corrected.
4. All changes that the IPA requires will be provided to MHCM in writing. MHCM shall incorporate such changes into its CAP and shall submit its revised CAP to IPA within five (5) business days.
5. Both parties shall monitor the progress of the corrective action plan. As specified in the CAP, MHCM shall provide periodic written reports regarding its progress.
6. If MHCM does not successfully complete the corrective action plan, IPA shall have the rights set forth in this agreement.

Failure to meet such Performance Standards in accordance with the CAP will result in a monthly payment deduction equal to the amounts listed below. Such payment deduction will be made from the IPA's monthly payment to MHCM for the provision of management services until the deficiency is corrected. At no time shall the cumulative monthly payment deduction exceed 5.00% of the IPA's monthly payment to MHCM.

| Reports: | 1.00% |
| Claims | 2.00% |
| Administration | 0.50% |
| Utilization Review | 1.00% |
| Finance | 0.50% |

Confidential and Proprietary Meridian Health Care Management, Inc.
NMG Amendment 003 020801 Exhibit C and D.doc